No. 2295.

CITY OF BRENHAM v. BRENHAM WATER COMPANY.

1. CITY CHARTER—STATUTE CONSTRUED.—Construing the charter of the city of Brenham, granted February 4, 1873, in connection with Articles 629 and 630, of the Revised Statutes, that city had power to enter into a contract by which it might be supplied with water. This power was derived from the charter alone, to be exercised by the city for the public good, and not under any private corporate right or proprietorship.

2. CONTRACT—CITY ORDINANCE.—An ordinance of the city of Brenham provided "that there is hereby given and granted to the Brenham Water Company the right and privilege, for the term of twenty-five years from the date of adoption of this ordinance, of supplying the city of Brenham and the inhabitants thereof with water for domestic and other uses, and for the extinguishment of fires." Construing this part of the ordinance in connection with other portions of it, and in connection with its fourteenth section, which in effect provided that the ordinance should be a contract between the city and the water company, whenever the company accepted the same in writing, *held:*

(1) That the language employed in the ordinance clearly evinced the purpose to confer on the water company the exclusive right to furnish the city of Brenham and its inhabitants with whatever water might be needed or necessary to be furnished by such a system, for a period of twenty-five years.

(2) The charter of the city conferred on the city the power to furnish the water, and this included the power to contract with some other corporation having power to so contract, or with some other person, to supply the water; the charter of the water company expressly authorized it to contract to supply the water.

(3) A municipal corporation may exercise, 1, powers expressly granted by charter; 2, those powers necessarily or fairly implied in or incident to the powers expressly granted; and, 3, powers essential to the declared

objects and purposes of the corporation. Any fair, reasonable doubt as to the existence of a power must be resolved by the courts against the corporation.

(4) No express power was conferred on the city of Brenham to make a contract giving to the water company the exclusive right to furnish the city and its people with water at a fixed rate for twenty-five years, and no power to make such a contract was necessary or essential to the exercise of powers expressly granted.

(5) Powers are conferred on municipal corporations for public purposes, and they can neither be delegated nor bartered away. Such corporations have no power either to cede away or embarrass their legislative or governmental powers, either through the agency of by-laws or contracts with others, so as to disable them from the performance of their public duties.

(6) The contract evidenced by the ordinance above referred to, and by its acceptance by the water company, would have the effect not only to embarrass the city government in the exercise of the power conferred on it, but to withdraw from it the right to provide water in any other authorized way, for public purposes and for the inhabitants of the city, which was the sole purpose for which the power to erect, maintain and regulate water works was given to it. This would result from the exclusive right which, from the terms of the ordinance, it intended to confer.

(7) The power of a city government to make such a contract as would disable it from controlling in future, as it might deem best, municipal affairs to which it refers, can not be implied from the express delegations of power to contract regarding the particular subject matter.

(8) When a contract is made by a city corporation not warranted by its charter powers, the city council have at all times the right to declare it null and to refuse compliance with it.

(9) The city of Brenham had no power to make the contract.

3. CASES REVIEWED.—Richmond County Gas Light Company v. Middletown, 59 New York, 231; Garrison v. City of Chicago, 7 Bissell, 486; Canal Company v. St. Louis, 2 Dillon, 84; City of Indianapolis v. Gas Light Company, 66 Indiana, 400; City of Valparaiso v. Gardner, 7 American and English Corporation Cases, 629, and Water Works Company v. Atlantic City, 6 Atlantic Reporter, 24, reviewed.

4. CITY ELECTIONS.—The very object contemplated by the legislature in compelling, by the terms of a city charter, frequent elections of city officers by the people, was to secure to them such control as would make the city government reflect as near as possible at all times the popular will. This object would be defeated if a city council could, even in dealing with an express power, barter away by contract its exercise for a long period of years, so as to deprive their successors of all discretion over the subject matter.

5. CITY IMPROVEMENTS.—In making permanent improvements, authorized by charter, contracts must be sustained, when the improvement remains the property of the city, to be controlled and dealt with as from time to time it may determine.

6. MONOPOLY—CITY ORDINANCE.—The Constitution provides: "Perpetuities and monopolies are contrary to the genius of a free government, and

shall never be allowed." The city of Brenham made a contract by which it gave the exclusive right to sell water to the city for public purposes to a company on specified terms for the period of twenty-five years, with the resulting obligation on the city to buy for public use. It gave also to the company the exclusive right to sell to the inhabitants of the city, for the same period, water for private uses. *Held:* .

(1) A grant which gives to one person, or to an association of persons, an exclusive right to buy, sell, make, or use a designated thing or commodity, or to pursue a designated employment, creates a monopoly.

(2) The right to exercise the exclusive privilege need not extend to all places; the monopoly exists if it operates in and to the hurt of one community. It need not continue indefinitely, so as to amount to a perpetuity; the monopoly exists, if the privilege be exclusive for a period of time.

(3) Such an exclusive right as was attempted to be granted by the city of Brenham would cut off future competition in supplying the city with water for a quarter of a century, tend to enhance the price of an article of necessity, and would constitute, within the meaning of the Constitution, a monopoly.

(4) Though the use of a street to lay down water mains may not be a matter of common right, yet when it becomes a means whereby an exclusive right is claimed to sell water and to compel the city and its inhabitants to buy, it can give no sanction to a contract whereby the use to be made of such mains will result in a monopoly.

(5) A franchise to supply a city with water will ordinarily involve the right to use its streets, but from its very nature it is subject at all times to control.

7. CASES REVIEWED.—Gas Light Company v. City Gas Company, 25 Connecticut, 18; State v. Cincinnati Gas Light Company, 18 Ohio, 293; City of Memphis v. The Memphis Water Company, 5 Heiskel, 525; New Orleans Gas Company v. Louisiana Light Company, 115 U. S., 650; and Crescent City Gas Light Company v. New Orleans Gas Light Company, 27 Louisiana Annual, 138–147, reviewed.

8. MONOPOLY—WATER COMPANIES.—An exclusive right in a municipal corporation to operate water works is distinguished from such an exclusive right held by a private corporation, in this, that in the former case the right is exercised by and for the people, not for profit but for the public welfare, and the correction of its oppressions and abuses in its management is in their hands; while, in the latter case, the right is exercised for private gain, with every incentive to oppress those who, under such a contract as was made with the city of Brenham, would be powerless to relieve themselves if the contract should be held valid.

APPEAL from Washington. Tried below before the Hon. I. B. McFarland.

*Tarver & Bryan* and *J. T. Swearingen*, for appellant, on their proposition that the contract with the city created a monopoly,

cited Garrison v. Chicago (1877), 7 Bissell, page 480; Richmond Gas Light Company v. Middletown, 59 New York, page 228; Illinois Railroad & Canal Company v. City of St. Louis, 2 Dillon, Circuit Court Reports, page 70 and notes; Niles Water Works v. City of Niles, 11 American and English Corporation Cases, page 299; Davis v. Town of Harrison, 5 American and English Corporation Cases, page 451; Gale v. Village of Kalamazoo, 9 American, page 80; same case, 23 Michigan, page 344; Putnam v. Grand Rapids, 58 Michigan, 416; Mayor, etc., of Jackson v. Bowman, 39 Mississippi, 671; San Diego Water Company v. San Diego, 59 California, 517; Cooley's Constitutional Limitations, section 204, et seq.; Dillon's Municipal Corporations, 96, 97, 716; City of Brenham v. Becker, 5 Law Journal, 289; Constitution of Texas, Article 8, section 6; Blackstone's Commentaries, 1 Blackstone, 90.

[NOTE.—Many authorities in the able brief of counsel for appellant are not given, since they refer to alleged errors not discussed in the opinion.—R.]

*Garrett, Searcy & Bryan* and *Bassett, Muse & Muse,* for appellee: On their proposition that the city council had under the charter the right to provide a supply of water for the extinguishment of fires, and for the convenience of its inhabitants, and was entrusted with a discretion as to the best means of making such provision, and the contract sued on was within the authority and discretion vested in the council, and neither created a monopoly, surrendered any portion of its legislative power, nor violated any principle of public policy, they cited City of Indianapolis v. Indianapolis, 66 Indiana, 396, 402; East St. Louis v. East St. Louis Gas Company, 98 Illinois, 415, 424, 425; Dillon on Municipal Corporations, third edition, sections 473, 474, 692; City of Valparaiso v. Gardner, 7 American and English Corporation Cases, 626, 628, 629.

STAYTON, ASSOCIATE JUSTICE. On August 18, 1884, the city of Brenham passed an ordinance which provided that an association of persons, then unincorporated, known as "Brenham Water Company," should have the right to establish, construct and operate a system of water works in or adjacent to the city, and for this purpose to use all the streets, alleys, lanes, public grounds, and all places under the control of the city, so far as

might be necessary for the proper conduct of the business, "and for supplying said city and the inhabitants thereof with fresh water for domestic, manufacturing, fire and other purposes."

The length of mains and pipes to be first established was fixed at not less than four miles, to be located as might be agreed between the company and the city, which were required to be extended as the city might order it to be done.

The seventh section of the ordinance determined the capacity the water works were required to have, and the eighth section gave the city the right to use water for public purposes other than the extinguishment of fires, which the city was to receive in full payment for all municipal taxes during the full term for which the contract was to run.

The ninth section secured to the city the right to purchase the water works, after the expiration of ten years, at such price as might be agreed upon by persons to be selected as therein provided, whose appraisement was to be binding on both parties.

Section 1 was: "That there is hereby given and granted to Brenham Water Company the right and privilege, for the term of twenty-five years from the date of the adoption of this ordinance, of supplying the city of Brenham and the inhabitants thereof with water for domestic or other uses and for the extinguishment of fires."

The fifth section is as follows: "The said city of Brenham hereby agrees to rent, and does rent, of the said Brenham Water Company thirty-five double nozzle fire hydrants, located by authority of said city upon the mains and pipes within said city, for the extinguishment of fires, at a rental of three thousand dollars per annum, payable quarterly, on the first day of January, April, July and October in each year. The said rental shall commence when the city is notified that the said hydrants are ready for use, and shall continue during the full term specified in this ordinance; and for the purpose of providing for the payment of all hydrant rental becoming due under the provisions of this contract, the city council shall levy, collect and appropriate annually a sufficient sum of money to cover the amount becoming due on this contract."

The sixth section provided that "the said Brenham Water Company shall make all extensions of mains and pipes whenever the said city council shall order the same to be made, and shall erect not less than at the rate of ten double nozzle fire hydrants to the mile on such extensions, for which hydrants the said city

of Brenham shall pay a rental of sixty dollars each per annum, payable as provided in section five."

The thirteenth section fixed the water rate which might be charged to inhabitants in most of the matters and businesses that could be enumerated, but as to some enumerated and those not enumerated, the charge was left to be fixed by contract to be made with the superintendent, and all rates were made payable quarterly in advance at the office of the corporation.

The fourteenth section provides that "this ordinance shall be a contract by and between the city of Brenham and the Brenham Water Company, their successors and assigns, and shall be binding on both parties thereto, provided said company shall file with the city clerk its acceptance of the same in writing within five days after the passage of the same."

The water company's acceptance was filed as required by the ordinance. Before the first of June, 1885, the persons composing The Brenham Water Company incorporated under the same name, under the general incorporation Act, and on that day the city was notified that the works were ready for use, but it was found that the water supply was not sufficient, whereupon the water company asked the acceptance of the works by the city, agreeing to give an additional supply of water equal to that they were then able to furnish, and to increase it as the consumption demanded it; to keep on hand such fuel as would enable it at all times to speedily put the pumps in motion in case of fire; to keep and maintain a telephone; to pump the stand pipe full every day, and to bank the fires under the boilers; to allow the fire department to fill the fire cisterns from any of the hydrants; and "to adopt and enforce strict rules and regulations for the faithful carrying out of the purposes for which it is intended, and to use every diligence to give the city of Brenham good and efficient fire service."

The city on the same day accepted the water works under the terms of the agreements then tendered, and in its ordinance so accepting it provided "that no payment shall be made on said contract if said company does not comply with its agreement herein before recited, but on compliance therewith the payments shall be made, commencing on the first day of June, 1885." The ordinances did not give to the city the power to regulate and control the water works, and to make them effective in case the water company failed to do so.

This action was brought to recover the price stipulated for the

use of hydrants for the time intervening between June 1, 1885, and January 1, 1886. The ordinance was made a part of the petition.

The city filed defenses thus summarized, in the brief of its counsel, correctly:

"1. A general demurrer.

"2. That it appeared from the petition that the contract sued upon created a monopoly and perpetuity in plaintiff.

"3. By special exception, that no authority to make said contract was therein alleged.

"4. That it appeared from said petition that the city council had rented the hydrants for a period of twenty-five years, at the yearly rental of three thousand dollars, and no authority was alleged in the council to bind the city for such a period of time.

"5. A general denial.

"6 and 7. That said contract was inoperative, against public policy and void, because the city of Brenham, having less than ten thousand inhabitants, was prohibited by the Constitution and laws of the State from levying for city purposes more than twenty-five cents on the one hundred dollars valuation on the property subject to taxation, and at the date of said contract the current expenses of the city, including salaries of officers and other reasonable and necessary expenses, annually incurred, exceeded the revenue derived from said tax."

"That there was no excess in any fund, which could be appropriated to the payment of the rent of said hydrants, and the council having no means to pay said rent, and having exhausted the limit of taxation allowed by law, were not authorized to contract said debt; that at the date of the contract the entire available current revenue of the city, out of which the expense incurred by said contract could be paid, amounted to the sum of eight thousand seven hundred and sixty-three dollars and thirty-one cents, an itemized statement of which is given, while the current expenses amounted to the sum of twelve thousand nine hundred and forty-two dollars and fourteen cents, an itemized statement of which is given; that these expenses, exceeding all the available revenues of the city, rendered the contract inoperative, illegal and void.

"8 and 9. That the contract was an attempt on the part of the council to surrender its legislative discretion and barter away the power conferred upon it by law, and was contrary to public policy.

"10.  The contract, under the pretense of obtaining water for the city, was in truth and in fact a donation.

"11.  That the price stipulated was so extortionate, unreasonable and oppressive as to render said ordinance void.

"12.  That said contract exempted the property of plaintiff from the payment of city taxes during the term of twenty-five years, and was in violation of law, which prohibits the council from appropriating the school tax and other special taxes to any fund other than that for which it was levied, and was therefore illegal.

"13.  The defendant specially denied that plaintiff complied with its undertakings, in consideration of which the promises of the defendant were made, particularly in reference to the quantity or supply of water to be obtained and the quality of the pipes and mains furnished by the company.

"14.  That for these reasons, among others, the council, on the tenth day of July, 1885, adopted 'An ordinance rescinding the contract with the Brenham Water Company, made August 18, 1884, and the supplemental contract made June 1, 1885, and repealing certain sections of the said ordinance, entitled an ordinance to provide a system of water works for the city of Brenham,' etc.

"The sections of said ordinance so repealed were all sections which required the water company to furnish water to the city for any purpose, or authorized the payment of plaintiff therefor, in the amount claimed in the suit.

"That the sections in the ordinance excepted in said repealing ordinance were the sections which gave the plaintiff the right and privilege of supplying water, and the provisions therein for the enjoyment and protection thereof.  That this ordinance of July 10 is a bar to plaintiff's action.

"15.  That at the date of the contract there was no such corporate body in existence as the Brenham Water Company.  That the pretended existence of such a corporation at the date of said contract was false and fraudulent.

"16.  That the said company, through its agents, falsely represented to and assured the council, as an inducement to the contract, that the system of water works would secure a general reduction in premiums paid for insurance, and that the amount saved in this way would be greater than the amount expended for water, and that, instead of such a reduction, the rates had been increased.

"17. That the supplementary contract of June 1 was made by the council while acting under a mistake of existing facts, and was obtained through the false representations of W. C. Connor, an agent of plaintiff. That the council was not afforded any opportunity of inspecting the mains and pipes, then under ground and inaccessible and in the possession of plaintiff, and the defects were of such a character as to render it impossible to discover them by any means available to the council, and that Connor represented that they were sufficient in every respect for the purposes designed, and that the council was misled by the fraudulent defects in said mains and pipes. That by reason of his false statements and misrepresentations, the alleged ordinance of acceptance was fraudulent."

The court sustained demurrers to so much of the answer as alleged that the contract created a debt in excess of the sum the city was authorized to raise by taxation, and to so much as set up the ordinance of July 10, 1885, rescinding the contract on which this action is based, and overruled the defendant's demurrers to plaintiff's pleadings.

The evidence introduced under the thirteenth, sixteenth and seventeeth paragraphs of the defendant's answer was conflicting. There was a verdict and judgment for the plaintiff.

The first assignment of error is that "the court erred in overruling defendant's demurrer alleging as objections to plaintiff's original and supplemental petitions:

"1. That the contract sued upon created a monopoly and perpetuity.

"2. That no authority was shown in the city council making the contract to bind the city for a period of twenty-five years, and the attempt to do so was invalid, because the council could not to that extent surrender its legislative discretion and barter away the authority reposed in it by law.

"3. Because the contract was an attempt upon the part of the council to limit the legislative authority of their successors and embarrass them in the exercise of their exclusive discretion."

The city of Brenham was incorporated under a special law approved February 4, 1873, and the first section of its charter declares that it shall "be capable of contracting and being contracted with." Section 5 of Article 24 of the charter gives the city power "to provide the city with water; to make, regulate and establish wells, pumps and cisterns, hydrants and reservoirs, in the streets or elsewhere within said city, or beyond the

limits thereof, for the extinguishment of fires and the convenience of the inhabitants, and to prevent the unnecessary waste of water." These are the only parts of the charter which have any bearing on the questions raised by the assignment.

The law under which the Brenham Water Company was incorporated provides that "Any gas or water corporation shall have full power to manufacture and to sell and to furnish such quantities of water or gas as may be required by the city, town or village where located, for public or private buildings, or for other purposes, and such corporation shall have power to lay pipes, mains and conductors for conducting gas or water through the streets, alleys, lanes and squares in such city, town or village with the consent of the municipal authorities thereof, and under such regulations as they may prescribe." (Rev. Stat., art. 629.) "The municipal authorities of any city, town or village in which any gas light or water corporation shall exist, are hereby authorized to contract with any such corporation for the lighting or supplying with water the streets, alleys, lots, squares and public places in any such city, town or village." (Rev. Stat., art. 630.)

All these laws may be looked to in determining the power of the city to make the contract involved in this case, though did it depend solely on the ordinance of August 18, 1884, and its acceptance, Articles 629, 630 of the Revised Statutes would not, in terms, be applicable.

Taking all the laws into consideration, we can not doubt the power of the city to make some contract through which the city might be furnished with water. It becomes necessary, for the proper determination of this case, to ascertain the character of the contract on which the rights of the parties depend. The subject matter of the contract was one over which the city had control solely under the power confided to it as a municipal government, to be exercised for the public good, and not under any private corporate right or proprietorship. The first section of the ordinance professes to give and to grant a right and a privilege to the water company to supply the city and its inhabitants with water for the period of twenty-five years.

Was it intended to make this right and privilege exclusive for that period of time? This must be ascertained from the language of the ordinance, the surroundings of the parties, and the purpose sought to be accomplished. The ordinance, in terms, professes to give and to grant a right to do certain things and

therefor to receive certain benefits for a quarter of a century, *i. e.,* to confer a claim to do certain things, and to receive a fixed compensation, which may be enforced for that period.

It not only professes, in general terms, to confer such a right, but, as if to emphasize it, and to fully illustrate the character of right intended to be granted, it terms it a *privilege.* The word "privilege," as used in the ordinance, is evidently not used in the technical sense in which it is used in the civil law, or even under the common law, where used in the sense of "priority," but was intended to be given its ordinary signification, mean-ing a right peculiar to the person on whom conferred, not to be exercised by another or others.

This right is to supply the city and its inhabitants with water, for their varied uses for twenty-five years, at fixed prices in enumerated cases, and at such prices as the water company and inhabitants may agree upon in other cases. The word "supply-ing" must be considered in its connection with a view to ascer-tain whether it was used in its primary sense or in one more re-stricted; and, so considered, we can have no doubt that it was used in its primary sense, intending thereby to give the water company the right and privilege to furnish to the city and its inhabitants what water might be needed or necessary to be fur-nished through such a system.

In the ordinance under consideration it can mean no less than to furnish all the water the city and its inhabitants may need to have furnished under the power given to the city through its charter, and this for the period of twenty-five years. It would do violence to the context to give to the word any other mean-ing. If nothing more appeared than we have considered, to give character to the contract and to illustrate the nature of the right intended to be secured through it, it seems to us that there is no escape from the conclusion that the parties contracted and intended to contract that the right of the water company should be exclusive.

The fifth and sixth sections of the ordinance, however, if there were doubt, it seems to us would remove it. The water company obligated itself to erect and maintain a given number of fire hydrants on the mains which it absolutely agreed to put down, and for the use of these the city agreed to pay the sum of three thousand dollars per year for the period named. It further obligated itself to extend its mains, if requested to do so by the city, and upon each mile of such extension to erect not less than

ten fire hydrants, for each one of which the city promised to pay a rental of sixty dollars per annum, as provided in the fifth section.

Was the city, in this and in another part of the ordinance to which we have referred, agreeing to receive and the company to furnish the entire quantity of water to be used for fire and other enumerated public purposes during the twenty-five years? The contract, in terms, obligated the city to pay for this, for the full period, whether it used the water or not, and thus made the only right valuable to the water company in so far exclusive. If the city refused to take the water, and obtained it elsewhere—if the contract was valid, and the parties are to be supposed to have so considered it—then the city would but assume a double burden, which it can not be conceived that the city ever contemplated.

The language of the contract, the surroundings of the parties and their evident purpose, forbid the belief that they either intended to make the right and privilege of the water company other than an exclusive right to furnish and be paid for all the water the city and its inhabitants might need to have furnished through a system of water works for the full period of twenty-five years.

Does the charter of the city of Brenham or that of the water company confer upon the city the power to make such a contract? Both charters may be considered together. The charter of the city doubtless gave it power to provide the city with water, and, under this, it may be held that it had the power to make a contract to receive and pay for water to be furnished by some other corporation or person. The charter of the water company expressly conferred upon it power to contract with the city to supply it with water for public purposes. Its charter, however, is under the general law, and the express power given to such corporations was evidently given to enable such of them as might be located in cities or towns having no such powers as had the city of Brenham to contract with them.

The summary of powers which a municipal corporation has and may exercise, as given by Mr. Dillon, was recognized as correct in the case of Williams v. Davidson, 43 Texas, 33. "*A municipal corporation possesses and can exercise the following powers and no others:* First, those granted in *express words;* second, those *necessarily* or *fairly implied* in or *incident* to the powers expressly granted; third, those essential to the declared

objects and purposes of the corporation—not simply convenient, but indispensable. Any fair, reasonable doubts concerning the existence of the power is resolved by the courts against the corporation and the power is denied." (Dillon, 89.)

No express power is conferred upon the city, through either or both of the charters, to make a contract through which the water company could become entitled to the use of the streets, and to have the exclusive right to furnish the city and its inhabitants with water at a fixed rate for twenty-five years; and we do not see that power to make such a contract was necessary or essential to the proper exercise of the power expressly given. Under charters containing grants of power less full and express than are contained in the charter of the city of Brenham, it has been held that power existed to erect and operate water works under the control and ownership of the municipality when it deemed it necessary to the public good. The legislature had given power to the city of Brenham to erect, control and regulate water works, and this it may exercise, if it has or may have the pecuniary ability, unless restrained by the contract under consideration.

The legislature has also given power to every city, within which one or more private corporations may have water works, to contract with one or all of them, and the further power to permit the use of its streets and other public grounds for the purposes of such works, contemplated by the statute, by as many water companies as may desire to do so. (Rev. Stat., arts. 629, 630, 3138.)

It is now universally conceded that "powers are conferred on municipal corporations for public purposes, and as their powers can not be delegated, so they can not be bargained or bartered away. Such corporations may make authorized contracts, but they have no power, as a party, to make contracts or pass by-laws which shall cede away, control or embarrass their legislative or governmental powers, or which shall disable them from performing their public duties." (Dillon on Municipal Corporations, 97.)

Whether and how a municipal government will exercise a discretionary power conferred upon it must necessarily depend upon the determination of that question by it in the exercise of whatever legislative power has been conferred upon it. To secure the means to carry out such legislative determination the making of one or many contracts may become necessary. The

validity of every contract a municipal corporation may assume to make must at last depend upon the validity of the law or municipal ordinance under which it is made.

If the legislature had expressly authorized the making of the contract under consideration, it would doubtless be binding, unless there be some constitutional objection to such a law—a matter which will be considered hereafter—and the ordinance could not be held to operate considered with its acceptance as a contract, as a surrender of any power the legislature intended the city government to exercise at all times. The question would then have been determined by a power superior to that of the municipality—a power from which it derives all the power it has, and even its existence as a corporation.

The city having been given such power as we have stated, it must be understood that it was intended not only that it might use it, but that it should use it, if deemed necessary for the public welfare, so long as the power is possessed by it, *i. e.,* until taken away by the legislature.

Will not the contract under consideration, if valid, have the effect, not only to embarrass the city government in the exercise of the power conferred upon it, but to withdraw from it the right to provide, in any other authorized way, water for public purposes and the use of its inhabitants, which was the sole purpose for which the power to erect, maintain and regulate water works was given to it? It seems so to us; for, as we have before said, the contract in effect assumes to give an exclusive right— assumes to surrender to a private corporation for a period of twenty-five years the power which the legislature conferred on the municipal government. The power given to a municipal corporation to contract in relation to a given subject matter, does not carry the implication that it may contract, even with reference to that, so as to render it unable in the future so to control any municipal matter over which it is given power to legislate as may be deemed best.

If the contract relied on is valid, neither the repeal of the charter of the city nor any other act of the legislature can abrogate it. If it is invalid, the city council had the right to delare it null and to refuse to comply with it.

In the case of Richmond County Gas Light Company v. Middletown, 59 New York, 231, the town authorities were empowered to cause the streets to be lighted with gas, and were required, when they deemed it necessary to do so, to contract with the gas com-

pany to furnish and lay down gas pipes, erect lamp posts and other necessary things, and to furnish gas. Under these facts, the authorities contracted with the gas company to furnish gas and light certain streets for the term of five years. Subsequently, the law 'which conferred authority on the town to make the contract was repealed, and an action was brought to recover for gas furnished after the repeal, and it was held that the contract was invalid, on the ground that such a contract could not deprive the legislature of its power to repeal a law affecting a municipal corporation.

It was said: "If the board of town auditors could deprive the legislature of this power for five years, by entering into a contract with the plaintiff for that time, it might for one hundred years by contracting for that period. I think it entirely clear that no such power was conferred by the Act on the town auditors."

A contract made with a municipal corporation is no more beyond its control, if its effect be to withdraw from or embarrass the municipality in the exercise of any legislative power conferred upon it, than is such a contract beyond the reach of the legislature that created the municipal corporation. It is solely the want of power to make the contract which authorizes either body to disregard it.

In the case of the State v. Gas Light Company, 18 Ohio State, 291, it appeared that the gas company had a charter which empowered it, within the city of Cincinnati, to do all the acts which gas companies incorporated under the general laws of this State are authorized to do, including the right to sell gas to the city and its inhabitants. The city of Cincinnati was also authorized, by its charter, to contract with gas companies for lighting its streets and to levy taxes to meet the expenses. So standing the charters, with the consent of the city, the gas company acquired all the rights which the city had contracted to permit an individual to enjoy. That contract embraced substantially the same rights and privileges as the contract before us professes to give to the plaintiff, and those were to be enjoyed for twenty-five years. The contract was held to be invalid.

Waiving a consideration whether the legislature of the State might have granted such rights and privileges, the court said: "Assuming that such a power may be exercised directly, we are not disposed to doubt that it may also be exercised indirectly, through the agency of a municipal corporation, clearly invested,

for police purposes, with the necessary authority. But we have referred to these authorities as our justification for saying that when a franchise so far in restraint of trade and so pregnant with public mischief and private hardship, is drawn in question and it is claimed to be derived through a municipal ordinance or contract, the power of the municipal authorities to pass the ordinance or enter into the contract must be free from doubt. It must be found on the statute books, in express terms, or arise from the terms of the statute by implication so direct and necessary as to render it equally clear."

In the case of Garrison v. City of Chicago (7 Biss., 486), it appeared that a gas company having corporate powers as broad as any the plaintiff can claim under its charter, contracted with the city of Chicago to supply it with gas for the period of ten years. The power of the city to buy gas, under its charter, was as full as is the power of the city of Brenham to contract for a water supply, and it was held that the city had no power to contract for so long a term.

In disposing of the case it was said: "The officers of the city— the members of the council—are trustees of the public. There can be no doubt that the right to regulate the lighting of the streets and to furnish means for the same by taxation, is, in its nature, legislative power. It concerns the whole public of the city. The effect of the contract in question, by the city authorities in October, 1869, if valid, was to bind their successors for ten years as to those matters of legislation. If it be conceded that the power existed, as claimed, then it practically follows that at the end of the term in 1879, a contract may be made by their successors without limit, and which may bind the public indefinitely. I am unwilling to sanction a principle which, in a case like this, would lead to such results. The safer rule is to hold the officers of a municipality to a rigid accountability in the discharge of their trust. In all cases of contract to run for years the authority to make them should be clear, because they involve pecuniary liability, and it is a tax upon future property owners." The principles asserted in the case of Canal Company v. St. Louis, 2 Dillon, 84, lead to the same result.

In some of these cases there seems to have been no power given to the municipal corporations to do, through works to be erected and controlled by themselves, the things for which they contracted with others; if so, the more patent is their illustration of the principle involved. The city of Brenham was not in that

situation. In the case of the City of Indianapolis v. Gas Light Company, 66 Indiana, 400, it appeared that the gas company, by its charter, was empowered to manufacture gas to be used for the express purpose of lighting the city of Indianapolis.

One section of its charter declared that "said company shall have the privilege of supplying the city of Indianapolis and its inhabitants with gas, for the purpose of affording light, for the term of twenty years." Another: "That nothing in this act shall be so construed as to grant to said gas light and coke company the exclusive privilege of furnishing said city with gas for the purposes within named." It was further provided that "the said city of Indianapolis, in its corporate capacity, shall have power to contract with said company to furnish gas for the purpose of lighting the streets, engine houses, market houses, or any public places or buildings."

The gas company contracted to furnish the city with gas for the period of five years from a given date, and the city refused to pay for service received during the time embraced in the contract, and to recover the price of that the action was brought. It was held that the city was liable for gas furnished after it had elected to treat the contract as a nullity, and had given notice that it would not pay for gas furnished, and for lighting, cleaning and repairing lamps on and after a day named. The provision in the charter that the act should not be construed to give an exclusive privilege to the gas company was evidently not intended as a legislative declaration that the city might not by contract grant an exclusive privilege, but simply to avoid a misconstruction of the charter itself, and to leave the city free to make such contract as it deemed proper within the powers granted.

The privilege given to supply the city and its inhabitants with gas for the period of twenty years, coupled with an express power to the city to contract, might well evidence an intention on the part of the legislature to permit it to contract for a longer period than was embraced in the contract made. If the legislature so willed, and there was no constitutional objection to such legislation, such a contract would be valid. From the report of the case it is doubtful, however, whether the legislation to which we have referred controlled the decision.

The gas company was chartered in 1851; the contract sued on was made July 22, 1876, and at some time after the incorporation of the gas company, whether before or after the contract was

made not appearing from the opinion, the city was reincorporated under a general law, one section of which gave the city power "To construct and establish gas works, or to regulate the establishment thereof by individuals or companies, or to regulate the lighting of streets, public grounds and buildings, and to provide, by ordinance, what part, if any, of the expenses of lighting any street or alley shall be paid by the owners of lots fronting thereon." The inference from the opinion is that the power of the city to make the contract was based on the power given to regulate the lighting of the streets. If so, then the decision does hold that the city had power to make the contract extending over several years under a grant of power of the most general power.

This case was cited as an authority to sustain a contract for a supply of water for a city embracing a period of twenty years. (City of Valparaiso v. Gardner, 7 Am. and Eng. Corp. Cases, 629.)

The city of East St. Louis was given power to contract and be contracted with; to provide for lighting the streets and erecting lamp posts and to make such ordinances as might be necessary to carry into effect these and other powers granted. The East St. Louis Gas company was given power by its charter to contract and be contracted with; power to manufacture and sell gas for the purpose of lighting the town of East St. Louis and territory contiguous, the town and city of that name being the same. The gas company was also given the exclusive privilege of supplying the town and contiguous territory with gas for thirty years, charges not to exceed the rate of another company and ten per cent added.

The city contracted for gas for the period of thirty years, and after it had received gas for some time under the contract it declined to receive more, holding the contract invalid for want of power to make it, whereupon an action was brought to recover sum due under the contract for the period the city had received and not paid for gas furnished. Under this state of facts, the Supreme Court of Illinois held that the city was liable for gas furnished before it disaffirmed the contract. The ground on which the contract was claimed to be invalid was the want of power to make a contract to bind the city for so long a period. The court did not pass on the validity of the contract, nor is there any intimation in the opinion of either of the three judges that the court would have declared the contract binding on the

city, while in an elaborate opinion by one of the judges it was held that the contract was void, and that it was beyond the power of the legislature to authorize it.

In Water Works Company v. Atlantic City (6 Atlantic Reporter, 24), it was held that a contract made by a city having power, under its charter, to provide a supply of water for the city by which it agreed to receive water from a water company, so long as the company complied with its obligation, was valid. From the report of the case, we can not ascertain fully what the charter powers of either corporation were; but to the objection that the city had no power to bind itself for an indefinite period, the court replied that the contract provided a means by which the city could terminate it at any time.

These are the leading cases bearing on the question before us, and we are of the opinion that the better reason is with those that hold that a municipal corporation has no power, under such laws as operate on the contract before us, to make such a contract. Municipal officers hold but for short terms—those of the city of Brenham but for one year—and the very purpose for which short terms of office and frequent elections are required is to leave the control of municipal affairs as near as may be in the hands of the people; to make the municipal administration reflect as near as may be the will of the public. The reasons but emphasize the necessity for denying to a city council or other governing body the power, by contract or otherwise, to disable or hinder from time to time the full and free exercise of any power, legislative in its character, which the legislature has deemed proper to confer upon such corporation.

Cases will arise in which it becomes necessary to make investments for permanent improvements, and as to such things the acts of the governing body then acting must necessarily be given effect. The improvement in such cases becomes the property of the city, and its power over it continues, through which it may use, change, or so deal with it as may be deemed best.

We do not wish to be understood to hold that a municipal corporation has no power, in any event, to contract for such things as are consumed in their daily use for a period longer than the official term of the officers who make the contract; but we do intend to be understood to hold that such corporations have no power to make contracts, continuous in character, in reference to such things or any others by which they will be, in

effect, precluded from exercising from time to time any power, legislative in character, conferred upon them by law.

There is, however, another question involved in this case which will be examined, reaching further than the one we have considered, and involving not only the power of the municipal corporation to make the contract sued on under the terms of the charters of both corporations, but involving the question of the power of the legislature, directly or indirectly, to confer upon the water company such rights and privileges as it claims under the contract.

It is claimed that the contract creates a monopoly, and that this is in violation of the Constitution, which declares that: "Perpetuities and monopolies are contrary to the genius of a free government, and shall never be allowed." If such is the effect of the contract, it is forbidden by the Constitution, and no legislation can give validity to it.

A grant which gives to one or an association of persons an exclusive right to buy, sell, make or use a given thing or commodity, or to pursue a given employment, creates a monopoly. There are, however, certain classes of exclusive privileges which do not amount to monopolies, and a consideration of these and the grounds on which they stand is not now necessary. The right to exercise the exclusive privilege need not extend to all places, it is enough that it is to operate in and to the hurt of one community.

It need not continue indefinitely so as to amount to a perpetuity; it is enough that it be an exclusive privilege for a period of time, of the character forbidden. The more general is its application as to places and persons, and the longer it is to continue, the more hurtful it becomes. In the case before us, the contract, as we have seen, gives the exclusive right to sell to a community, for public purposes, for the period of twenty-five years, thus affecting all the inhabitants in their common right directly, and in their individual rights at least indirectly.

This right to sell for public purposes carries with it, through the contract, the obligation to buy for public uses. It gives the exclusive right to sell to the inhabitants of the city for the same period, for all the private uses for which they may need water, in such ways and to be so applied as it can be only by a system of water works, which is a denial in effect to the inhabitants of the right to buy for these private purposes from any other water company. Such an exclusive right prevents competition and

tends to high prices, all matters affecting which the contract before us surrenders the right further to regulate for a quarter of a century.

It has been said, in cases to which we will hereafter refer, that there can be no monopoly in the use of a street to lay down gas or water mains or pipes, because it is not a matter of common right to use streets for such purpose. This may be admitted without affecting the question before us. When such use, however, is but a means to the exercise of an exclusive right to sell water, and to compel a city or its inhabitants to buy it, it will be found difficult to separate the means from the end intended to be accomplished.

A system of water or gas works may be operated in a town or city as well by one individual as by a private corporation, if he have the ability. No corporate franchise is necessary to that purpose. It is an occupation in which any person may engage if he has the means, which may and ordinarily will involve the right to use streets and other public grounds. This means to accomplish the purpose can ordinarily be acquired only through permission given directly or indirectly by the State; but cases may arise in which no such consent would be necessary. Such a franchise, when granted, is one of the feeblest character, and from its nature subject at all times to control.

Some conflict of authority exists as to whether such contracts as that under consideration create monopolies. The question has arisen in several cases in which gas and water companies asserted exclusive right to use streets for laying down mains and pipes under charters granted which, in terms, gave exclusive right. The question has most frequently arisen in cases between rival companies seeking to use streets, and in which no further right was directly involved.

In The Norwich Gas Light Company v. Norwich City Gas Company, 25 Connecticut, 18, it appeared that a gas company, holding a charter which, in terms, gave it the exclusive right to use streets for the purpose of laying down pipes, erecting gas posts, burners, and other things necessary to lighting the streets, alleys, lanes, public grounds, and other places, sought to restrain a rival gas company from using the streets for a like purpose; and it was held that the charter created a monopoly which the court would not sustain, even in the absence of a constitutional provision forbidding monopolies.

Such a claim asserted by a gas company, holding under a

contract with a municipal corporation which assumed to give the company the exclusive right to use the streets for the purposes of its business, in another case was held to be a monopoly, and on that ground the claim held to be invalid. (The State v. Cincinnati Gas Light Company, 18 Ohio, 293.) The case of The City of Memphis v. The Memphis Water Company, 5 Heiskel, 525, was very similar in its facts to the Connecticut case above noticed, and it was held that the exclusive right to use the streets of the city, given to the water company by its charter, did not create a monopoly.

As this case fairly presents the theory on which such exclusive grants to use streets for gas and water purposes are maintained, we will quote a part of the opinion. The court said: "The question, then, is narrowed down to the inquiry, did the individuals composing the Memphis Water Company have the right, before their incorporation, in common with all others, to erect water works in Memphis, to take up pavements, occupy the streets, and do such things as were necessary and proper in completing their water works? It is clear that none had the right to do these things except the city of Memphis, by virtue of its corporate powers; and this right on the part of the city was exclusive, until it was taken away by the legislature and transferred to the Memphis Water Company. It is no more a monopoly, when conferred on the water company, than when it belonged to the city of Memphis. It was an exclusive privilege when exercised by the city; it is an exclusive privilege in the Memphis Water Company, but not a monopoly."

In New Orleans Gas Company v. Louisiana Light Company (115 U. S., 650), it appeared that the plaintiff had a charter which gave it the exclusive right, for the period of fifty years, of making and supplying gas lights to the city of New Orleans by means of pipes or conduits laid in the streets to such persons as might voluntarily choose to contract for it. The defendant was subsequently chartered under a general law authorizing the formation of corporations for certain purposes, among which was the construction and maintenance of works for supplying cities and towns with gas, and it had obtained permission from the common council of New Orleans to use its streets and other public ways and places to lay mains, pipes and conduits. This it was proceeding to do when a suit was brought to restrain it, and it was held that the exclusive grant, in connection with the facts shown, constituted a contract which State legislation could not impair.

In disposing of the case it was said: "Legislation of that character is not liable to the objection that it is a mere monopoly, preventing citizens from engaging in an ordinary pursuit or business, open, as of common right, to all upon terms of equality; for the right to dig up the streets and other public places of New Orleans and place therein pipes and mains for the distribution of gas for public and private use, is a franchise, the privilege of exercising which could only be granted by the State, or by the municipal government of that city acting under legislative authority." To the same effect is the decision of the Supreme Court of Louisiana in Crescent City Gas Light Company v. New Orleans Gas Light Company, 27 Louisiana Annual, 138, 147, in which it was said: "The right to operate gas works and to illuminate a city is not an ancient or usual occupation of citizens generally. No one has the right to dig up the streets and lay down gas pipes and carry on the business of lighting the streets and the houses of the city of New Orleans without special authority from the sovereign. It is a franchise belonging to the State, and, in the exercise of the police power, the State could carry on the business itself or select one of several agents to do so."

Subsequently to the granting of the charter, through which the plaintiff claimed, the Constitution of the State of Louisiana was so changed, while preserving rights, claims, and contracts then existing, as to provide that "the monopoly features in the charter of any corporation now existing in this State, save such as may be contained in the charter of railroad companies, are hereby abrogated," and it was claimed that this could operate to divest the plaintiff's privilege. As to this the court, however, said, "The monopoly clause only evinces a purpose to reverse the policy previously pursued, of granting to private corporations franchises, accompanied by exclusive privileges as a means of accomplishing public objects. That change of policy, although manifested by constitutional enactment, can not affect contracts which, when entered into, were within the power of the State to make."

The inference from the language used is that, had the constitutional provisions in regard to monopoly features in charters been in force when the plaintiff's charter was granted, its exclusive privilege, franchise or whatever it may be termed, would have been inoperative. In New Orleans Water Works Company v. Rivers, 115 United States, 674, a suit was brought by the

company to restrain Rivers from laying pipes, mains and conduits, from the Mississippi river to the St. Charles Hotel, and the claim was based on the fact that the plaintiff had a charter which gave it the exclusive right to supply the city of New Orleans and its inhabitants with water from the Mississippi river or other stream by mains or conduits, with such right to lay them in the streets, public places and lands of the city, which had been granted in consideration that it would furnish water to the city free of charge. The claim of the plaintiff was sustained and the charter held to be a contract that could not be impaired by the constitutional provision afterwards adopted, to which reference is made in the preceding case.

The same inference may, however, be drawn from the opinion, as to what would have been the effect of the provision of the Constitution, repealing "the monopoly features in the charter of of any corporation," had it been operative at the time the plaintiff's charter was granted.

In the case of the State v. Milwaukee Gas Company, 29 Wisconsin, 460, it was conceded that the grant of an exclusive right to lay pipes, for the purpose of conducting gas, in the streets, avenues and other public places of a city, coupled with the exclusive right to manufacture and sell gas to its inhabitants for fifteen years, created a monopoly. In the Slaughter House cases (16 Wall., 61, 65, 102, 121, 128), it was conceded that the exclusive privilege in question in these cases was a monopoly, but in these, as in the case last above cited, it was held that in the absence of some constitutional provision forbidding monopolies the grant of these exclusive privileges was not invalid.

Under an exclusive grant of privileges similar to those in question in the "Slaughter House" cases, it was held in the case of City of Chicago v. Rumpff, 45 Illinois, 97, that a monopoly was created. The court said: "Such action is oppressive, and creates a monopoly that never could have been contemplated by the general assembly. It impairs the rights of all other persons and cuts them off from a share in not only a legal but a necessary business. In the case of The State v. Gas Company, 34 Ohio State, 581, it was held that such an exclusive right as the contract in this case gives created a monopoly.

It will not do to say that an exclusive right in a municipal corporation to operate water or gas works stands upon the same ground as does such exclusive right held by a private corporation or an individual.

In the one case the right is, in effect, exercised by the people, who are to be affected by it, and not for profit, but for the welfare and convenience of the public and the inhabitants of the corporation. The correction of abuses in its management, whereby oppression may be avoided, is in the hands of the people, while on the other hand such works are operated for private gain, with every incentive to oppression, without power, in those to be affected, to relieve themselves from it.

In the one case the exclusive right may create a monopoly, and in the other, not. The exclusive rights, given by the contract before us, lead to the same results as a monopoly in any other matter, and whether a monopoly or not is best ascertained by the results which are brought about by a contract or law and the exercise of rights the one or the other may profess to confer.

We are of the opinion that the exercise of the exclusive rights conferred on the water company produce the same results as would the exercise of an exclusive right which would fall within the most exacting definition of a monopoly, and that the allowance or creation of such exclusive rights is contrary to the spirit of the Constitution of this State.

There are many other questions in this case which, in view of the controlling character of those already considered, need not be examined.

If the appellee furnished water between the time the works were put in operation under the ordinance passed June 1, 1885, and the tenth of July of that year, when the city declined further to regard the contract as binding, for that the city ought to be held liable, but this is the extent of the right of the appellee to recover for water furnished the city.

The judgment will be reversed, and the cause remanded.

*Reversed and remanded.*

Opinion delivered March 25, 1887.