**GULF BITULITHIC CO. v. NUECES COUNTY.    (No. 7751.)**

Court of Civil Appeals of Texas. San Antonio. June 15, 1927.

Rehearing Denied July 30, 1927.

1. Highways ⬅113(3) — Contract whereby plaintiff agreed to supervise road construction for county held not cost plus contract, and thus void.

Contract whereby county employed plaintiff as agent and representative to organize, assemble, and operate necessary organization to manage and supervise construction of roads, and whereby county was to pay for materials and equipment and to pay plaintiff 6 per cent. of cost of construction, was not cost plus transaction, which could be avoided by county upon that ground.

2. Municipal corporations ⬅58—Doubt as to power of municipal corporation is resolved against corporation.

Where existence of particular power is fairly or reasonably in doubt, doubt must be resolved against municipal corporation.

3. Highways ⬅95(1)—Commissioners' courts in exercising power delegated to counties regarding roads cannot go beyond powers expressly granted or fairly implied or essential to declared objects (Const. art. 3, § 52, art. 5, § 18, art. 11, § 2; Rev. St. 1925, arts. 726 et seq., 2351, 2352, 6663 et seq.).

In exercising authority granted to counties, under Const. art. 3, § 52, art. 5, § 18, art. 11,

§ 2, Rev. St. 1911, arts. 627 et seq., 2241, 2242, 6859 et seq. (Rev. St. 1925, arts. 726 et seq., 2351, 2352, 6663 et seq.), commissioners' courts cannot go beyond powers either expressly granted, or fairly or necessarily implied from language of grant, or which are essential to declared objects of grant.

4. Counties ⬅113(1)—Commissioners' court cannot bargain away powers delegated to counties so as to embarrass county in exercise of governmental powers.

Commissioners' court cannot bargain away powers conferred on county by state so as to materially hamper or embarrass county in full and free exercise of its legislative or governmental powers and duties.

5. Highways ⬅113(3)—Contract by county employing firm to supervise road construction without competitive bidding was invalid.

Contract whereby county employed construction company to organize, assemble, and operate necessary organization to manage and supervise building and construction of roads without competitive bidding was void.

6. Highways ⬅113(3) — Contract whereby county agreed to pay plaintiff 6 per cent. of cost for supervising road construction held void because compensation was so excessive as to constitute fraud.

Contract whereby county employed plaintiff to supervise construction of roads and agreed to pay plaintiff 6 per cent. of total cost of construction *held* to be void because compensation allowed was so grossly excessive, unreasonable, and unconscionable as to constitute legal fraud on county.

7. Highways ⬅113(3) — Contract whereby county employed plaintiff to supervise road construction held void because it bargained away county's legislative and governmental powers.

Contract by county through commissioners' court whereby county employed plaintiff to supervise construction of roads in county *held* void and unenforceable, because, under contract, commissioners' court tied its own official hands and bargained away county's legislative and governmental powers, whereby it was disabled from performing its duties to public.

8. Highways ⬅113(3)—Contract by commissioners' court employing plaintiff to supervise road construction was not binding on court beyond terms of contracting commissioners.

Contract between commissioners' court and plaintiff, whereby commissioners' court employed plaintiff to supervise construction of roads in county, was not binding upon court beyond terms of contracting commissioners.

9. Limitation of actions ⬅11(2)—Action by county to recover money unlawfully paid out under contract by county from public funds derived from sale of bonds voted by people and issued to construct highways was not barred by 2 years' statute of limitations.

In suit against county for breach of contract whereby county employed plaintiff to supervise construction of roads, cross-action by county to recover money unlawfully paid out

by county under void contract from public funds derived from sale of bonds voted by people and issued and sold for purpose of constructing and maintaining public highways, some of which constituted parts of state highway system, was not barred by 2 years' statute of limitations, since statute does not run as to causes of action accruing to county in its public or governmental capacity or while acting for and as an instrumentality of state.

**10. Highways ⟜113(4)—County could recover money paid out under void contract employing one to supervise road construction.**

County could recover payments unlawfully made under void contract, whereby commissioners' court had employed one to supervise construction of roads.

Appeal from District Court, Nueces County; W. B. Hopkins, Judge.

Action by the Gulf Bitulithic Company against the County of Nueces, in which the defendant filed a cross-action. From the judgment, plaintiff appeals, and defendant filed cross-assignments of error. Affirmed in part, and in part reversed and rendered.

Kleberg & North, of Corpus Christi, Vinson, Elkins, Sweeton & Weems, of Houston, and Robert W. Stayton, of Austin, for appellant.

Boone & Savage, of Corpus Christi, for appellee.

SMITH, J. The appeal has to do with the nature and extent of the powers and discretion of county commissioners' courts in the expenditure of money derived from the sale of county bonds for the construction and maintenance of public roads.

At a county-wide election held in Nueces county on July 20, 1919, the commissioners' court of that county was authorized to issue bonds in the sum of $2,000,000 for the purpose of constructing, maintaining, and operating macadamized, gravel, or paved roads, etc., in the county. In pursuance of this authority the commissioners, on August 11 thereafter, issued said bonds in three series, the first of which, A, was in the sum of $100,000 appropriated to the retirement of bonds previously issued by one of the subdivisions of the county, and not involved in this litigation; the second series, B, aggregating in amount the sum of $1,000,000, and the third, C, $900,000. None of the bonds were sold at the time of issuance.

On September 14 in the same year a disastrous hurricane swept the county, and particularly the city of Corpus Christi, resulting in great loss of property and consequent depressed business conditions. The commissioners' court took prompt cognizance of these conditions and sought to use their power to alleviate them. They decided to postpone, indefinitely, the sale of series C of the bonds in order to reduce the necessary tax levy, which was done, and to sell only series B at that time. As a further step toward alleviation the commissioners also decided not to construct the proposed system of roads by letting the contract therefor upon competitive bids to outsiders, but to themselves construct them in order to give employment to local residents. They were also moved to this course by the high and still rising cost of materials prevailing at that time; they believed they could do the work cheaper than they could get it done by contract.

Some years prior to this time the city of Corpus Christi had engaged in a comprehensive program of street paving, under contracts with the Texas Bitulithic Company, a subsidiary of Warner Bitulithic Company and the parent of the Gulf Bitulithic Company, appellant herein. It appears impressively in the record that this work done on the streets of Corpus Christi greatly pleased those in authority in that city and in Nueces county. The paving laid by that company years before the storm survived, unscathed, the ravages not only of the intervening years, but of the hurricane as well. These evidences of the strength and durability of this paving seems to have been greatly impressed upon the members of the commissioners' court who were serving in 1919 and, together with their acquaintance with and confidence in the officials of the paving company, now officials of the Gulf Bitulithic Company, largely influenced them in entering into the contract now in controversy.

So, when the commissioners' court set about to consider the important matter of constructing a system of roads out of the money voted by the people, they put in mind the excellence of the street paving in Corpus Christi, and apparently sought to visualize a system of county roads of the same material. Having great confidence in the officials of the company which paved the streets of Corpus Christi, but who had in the meantime become the officials of appellant, Gulf Bitulithic Company, the commissioners consulted those officials very freely and fully as to the wisest course to pursue in the project before them. The cost of road materials and supplies, and freight charges thereon, was very high at that time and was still rising. It was considered that road contracting companies could not afford to and would not submit bids for road contracts except upon the basis of existing high prices of materials and supplies, with additional latitude for possible increases in those prices; that if the county let the work upon such contracts it could not avail itself of any reduction of prices likely to occur during the progress of the work; that if the commissioners themselves undertook the work they could avoid the inflation of exist-

⟜For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

ing prices upon which contractors would base their bids, and could also get the full benefits of any reduction in prices occurring during the progress of the work, which would run through a period of many months. In other words, it was decided by the commissioners, influenced largely by the counsel of the officials of the Gulf Bitulithic Company, that by doing the work themselves they could realize more for the county out of the bond money than they could get by letting the work by contract upon competitive bids. The question, also, of state and federal aid was considered. It was understood that if the work should be done by contract certain substantial aid, to wit, about $200,000, would be given the county by those authorities, but the commissioners, upon consideration, concluded that the benefits derivable from that aid would be more than offset by the restrictive interference of those authorities. So the decision was reached that the road program be carried out by the county doing its own work at direct expense, without the intervention of construction contracts.

It is obvious from the record that the commissioners were further influenced to the course stated by the assurance that they could get the supervisory services of the Gulf Bitulithic organization in constructing the proposed road system. As stated, the managing officials of that company were managing officials of the Texas Bitulithic Company when the Corpus Christi streets were paved, and the members of the commissioners' court knew them and had full confidence in their integrity and their skill as street and road makers. They fully consulted those officials with reference to the proposed road building program, and were assured of the friendly co-operation of those officials. As a result of numerous conferences, the commissioners' court entered into a contract with the Bitulithic Company, which contract was embraced in the following resolution passed by the commissioners' court (formal parts omitted):

"Whereas, in the judgment of the commissioners' court of Nueces county, Tex., it is expedient and to the best interest of the county and the taxpayers thereof that the roads and highways of this county, to be built and constructed out of and with the proceeds of the Nueces county special road bonds heretofore authorized by vote of the taxpaying voters on July 26, 1919, be built and constructed by the commissioners' court and under the direct supervision and control of the court, and not by general contract, and that such plan of construction will result in better and more permanent roads at a material saving in cost to the county:

"Therefore, it is ordered by the commissioners' court of Nueces county that the system of roads and highways, provided for by said Nueces county road bonds, issued the 11th day of August, 1919, be constructed by the county under the supervision of the commissioners' court, and that the said court employ the Gulf Bitulithic Company as its agent and representative to supervise and manage the construction of the said roads, subject to the following contract:

"The State of Texas, County of Nueces:

"Know all men by these presents, that this agreement, entered into by and between the county of Nueces, acting by and through its commissioners' court, hereinafter called the county, and the Gulf Bitulithic Company, acting by and through its president, James H. Pittman, hereinafter called the company, witnesseth:

"That in consideration of the premises and the services to be rendered by the company as hereinafter provided, the county does hereby employ the Gulf Bitulithic Company as its agent and representative to organize, assemble, and operate the necessary organization to manage and supervise the complete building and construction of all the roads and highways embraced in the present proposed Nueces county road system, and to procure, assemble, and operate for, and at the expense of, said county all of the necessary organization, labor, machinery, tools, teams, equipment, facilities, supplies, and foremen, and to do any and all things necessary and proper to enable the county to build and construct said roads in accordance with the plans, specifications, and drawings furnished by the county highway engineer, subject, however, to the supervision, direction, and instructions of the commissioners' court of said county. All of which said organizations, labor, material, freight, machinery, tools, teams, equipment, facilities, and supplies shall be paid for by the county under such terms and conditions as it may authorize and direct. In the organization, selection, and acquisition of same, and in the disposition and sale of unnecessary machinery and equipment the company shall render to the county its best advice, assistance, and aid in securing for the county the best and most advantageous price, terms, and conditions.

"The county shall also pay the cost of all deposits, rentals, employers' liability insurance, bonds, insurance premiums, royalties, office expenses, transportation charges, and all other expenses and charges which may be incurred and incident to the building of said roads under this agreement; provided, however, any and all expenditures under this agreement shall be subject to the approval of the commissioners' court, or some duly authorized officer thereof.

"The company shall begin the said work herein specified at the earliest time practicable, and diligently proceed under direction of said commissioners' court so that such work may be carried on with dispatch and completed as soon as practicable. The company shall keep a superintendent on the work at all times until completed.

"In consideration hereof and of the services rendered and to be rendered by the Gulf Bitulithic Company, Nueces county hereby obligates and binds itself to pay to the Gulf Bitulithic Company a sum of money equal to 6 per cent. of the total cost incident to the construction of said roads.

"Payment thereof to the Gulf Bitulithic Company by Nueces county shall be made on or before the 10th day of each month hereafter,

and shall be based upon all expenditures in connection with said work which have been actually paid by said county up to and including the last day of the preceding month; provided, however, in determining the said amount due said company, the amount paid by the county for engineering services, the amount received by the county from the sale of any equipment, and amounts paid to the company as compensation shall not be taken into consideration.

"An itemized statement of all such expenditures shall be furnished the company by the county each month.

"It is understood and agreed that no salary shall be paid by the county to any officer of the company, nor to the general superintendent of construction.

"This contract shall not become effective and binding until the sale of the bonds herein referred to has been consummated and sufficient portion of the proceeds thereof placed in the county treasury to begin operations.

"For the faithful performance of all the terms of this contract the parties hereto bind themselves on this the 12th day of November, A. D. 1919."

In the language of a finding by the trial court:

"This contract was awarded to Gulf Bitulithic Company without advertisement or competitive bidding, and the commissioners' court did not require, and the Gulf Bitulithic Company did not execute or deliver to the county, bond or any other security for the performance of said contract."

Under the contract the commissioners' court proceeded with the construction of the planned system of roads until the funds derived from the sale of series B of said bonds were exhausted. This activity covered the period from March 27, 1920, to the month of May, 1922, when the commissioners' court completed the payment to the company of the amount earned by it up to that time, under the provisions of the contract, through the expenditure of the amount derived from the sale of series B of the bonds, and notified the company that "its services would no longer be required." The company protested against its discharge, refused to accept dismissal, and advised the commissioners that it was at all times ready, able, and willing to perform its obligations under the contract, as the evidence and the court's findings showed it to be. The commissioners, however, notified the company that it would not be permitted to further participate in the road-building program, and it did not do so. The amount paid the company for its services in the matter was $50,287.45, or, as provided in the contract, 6 per cent. of the amount expended, less certain deductions stipulated in that instrument. Out of this amount the company paid the salary of its local superintendent on the work as well as the expenses incurred by its officials in connection with the project, the whole amounting to $9,629.81. Otherwise it had no expense in the matter.

Subsequently, the commissioners' court sold the remaining series of bonds, aggregating $900,000, advertised for bids upon the remaining work to be done, let the contract to the lowest bidder, of whom the statutory bond was exacted, and otherwise complied with the appropriate statutes. After the work was completed under this contract, and after all the funds derived from the sale of the several series of bonds had been expended, the Gulf Bitulithic Company brought this action against Nueces county for damages for breach of contract, which damages were placed at the net amount the company would have realized had it been permitted to complete performance of the contract by continuing its services through the expenditure of the proceeds of series C of said bonds. The amount was alleged to be $52,500, or 6 per cent. of $900,000, less certain stipulated deductions. The county answered, setting up that the contract was illegal and void, and by way of cross-action sought to recover the amount it had paid the company under that contract. The court rendered judgment against the company upon the ground that the contract was void, and against the county on its cross-action upon the ground that it was barred by limitation. The company appealed, and the county filed and here urges cross-assignments of error.

From among the findings of fact by the trial court we copy the following:

"Fourth. On or about the 1st day of August, 1919, the commissioners' court of Nueces county regularly and duly employed one H. A. Stevens, a civil engineer, as county engineer of said county, to make a survey, prepare plans and specifications, and to supervise and superintend the construction, maintenance, and operation of the macadamized, graveled, or paved roads proposed by the commissioners' court of said county to be constructed in Nueces county out of moneys to be derived from the sale of said bonds, at a monthly salary of $500 per month. Such employment was originally for a 2-year period and subsequently, by amendment and due order, the employment of said engineer was limited to 12 months at said salary."

"Eighth. After the sale of series B of said bonds, aggregating face value of $1,000,000, referred to in previous findings, Gulf Bitulithic Company began the performance of the services rendered by it under said contract and sent C. L. Francis as its superintendent to Nueces county to represent it in the performance of this contract, and Francis arrived in Nueces county and began work on or about March 27, 1920, assembling labor and material, and remained in Nueces county in the performance of the services for which he was employed by Gulf Bitulithic Company until on or about January 15, 1922, when he was succeeded by E. G. Castleberry as superintendent for Gulf Bitulithic Company. Castleberry continued as superintendent for Gulf Bitulithic Company under said contract until the work done under the supervision of Gulf Bitulithic Company was completed." .

"Tenth. The services rendered by Gulf Bitulithic Company to county of Nueces provided for in said contract and in the performance of

said contract consisted of the services of said C. L. Francis, its superintendent, and his successor, who were on the ground representing Gulf Bitulithic Company in the assembling of labor and material and in the supervision and superintendence of the work of building and constructing said roads; occasional visits of officials of Gulf Bitulithic Company to Nueces county for the purpose of looking over the work, and occasional conferences with the commissioners' court, and occasional consultations and recommendations as to construction; the assembling of material and labor and the purchase of equipment and machinery. In the performance of their services the representatives of Gulf Bitulithic Company worked in conjunction with the county engineer so employed by Nueces county, and the county engineer, during the entire time of the employment of Gulf Bitulithic Company in this construction for Nueces county, represented Nueces county in the superintendence and supervision of the work of construction and participated in consultations and recommendations as to construction and purchase of machinery and equipment. Francis and his successor made all reports of progress and cost of construction to Gulf Bitulithic Company and none to the county of Nueces.

"Eleventh. Nueces county furnished and paid for all labor, material, machinery, and equipment of every kind and character that was used in building and construction of the roads that were built with the proceeds of the sale of series B of said bonds during the time that Gulf Bitulithic Company rendered the services by it under said contract, and Nueces county paid the salaries and wages of the general foremen, foremen, and other employees on the work and all incidental expenses in connection with their employment, such as furnishing automobiles, etc., except that it did not pay the salary of C. L. Francis, superintendent for Gulf Bitulithic Company, whose salary was paid by said company, but the county furnished Francis with an office and an automobile and gas therefor while he was engaged in the work and paid the expenses of the operation and upkeep of the automobile used by said Francis, and the county also paid the expenses of all liability and other insurance which was taken out while the work was in progress under the supervision of Gulf Bitulithic Company. Gulf Bitulithic Company did not furnish or supply or pay for anything used in connection with said work, except C. L. Francis, its superintendent, and his salary, and some incidental expenses of said Francis, the traveling expenses of some of its officials on occasional trips of inspection to Corpus Christi, and a few incidental expenses of that character, and the entire sum of money expended by Gulf Bitulithic Company during the entire time of its operation under said contract, including the salary paid by it to Francis and his successor, amounted to the sum of $9,629.81, and for the services performed by it for Nueces county under said contract Gulf Bitulithic Company was paid by Nueces county said sum of $50,287.45.

"Twelfth. The personnel of the commissioners' court changed after the contract with Gulf Bitulithic Company was made, and some members of the court became dissatisfied with the performance of the contract by Gulf Bitulithic Company and were of the opinion that the road construction under supervision of Gulf Bitulithic Company was costing the county too much money and that the county was not getting as much highway construction for the money expended as the commissioners' court had expected. On account of the fact that the commissioners' court of Nueces county had not advertised for bids and awarded the road contracts on competitive bidding, Nueces county was unable to obtain state or federal aid in the construction of roads being built and constructed under the supervision of Gulf Bitulithic Company, and when the proceeds of sale of the first million dollars of bonds had been expended on road work under the supervision of Gulf Bitulithic Company, the commissioners' court realized that the county did not have funds sufficient to complete the roads contemplated and proposed to be built and constructed with the proceeds of the sale of the second million bond issue, and that it was essential that the county receive state and federal aid. On account of dissatisfaction with the performance of the contract by Gulf Bitulithic Company and the fact that state and federal aid were needed in highway construction in the county, the commissioners' court decided that it was to the best interest of the county to have the remainder of the road construction work in Nueces county done by contract after public advertisement and competitive bidding, and thereupon on or about May 22, 1922, the commissioners' court passed an order approving the estimate of Gulf Bitulithic Company for the month of May, 1922, which completed the expenditure of the proceeds of the first million dollars in road construction work in Nueces county, authorized the payment of said estimate in full payment and satisfaction of the contract between Nueces county and Gulf Bitulithic Company, and notified Gulf Bitulithic Company that its services would no longer be required. Gulf Bitulithic Company insisted that its contract had not been fully performed and that it was entitled to continue the performance of its services under said contract and to receive the compensation provided for in said contract, and advised the commissioners' court that it was at all times ready, able, and willing to perform the services agreed by it to be performed under said contract. On September 30, 1922, the commissioners' court passed an order instructing the county judge to advise the Gulf Bitulithic Company that the commissioners' court of said county did not recognize or acknowledge its right to superintend the construction of any roads in Nueces county and that it would not thereafter recognize or permit it to in any manner participate in road building in Nueces county, as the county claimed that it had completed its agreement with said company on June 16, 1922. Thereafter Gulf Bitulithic Company did not perform any further services under its contract with said county, although it insisted on its rights under the contract, tendered performance of its services under said contract, and was ready, able, and willing to perform such services. Thereafter Gulf Bitulithic Company was engaged in paving work in Houston and other localities during that time that it would have been engaged in the performance of services under the contract with Nueces county."

"Sixteenth. Had Gulf Bitulithic Company been permitted by Nueces county to supervise

the road construction with the proceeds of the sale of series C of said bonds, Gulf Bitulithic Company would have performed the same character of services performed by it under the expenditure of the proceeds of sale of series B of said bonds and could have performed such services at a cost to it not in excess of $20,000, including all overhead expenses, which would have left a net profit to the company of $27,-598.38.

"Seventeenth. Nueces county was not able to build all the roads contemplated by the commissioners' court at the time the two million bond issue was authorized and issued and was not able to hard surface all of the roads which were constructed with the proceeds of said bond issue and the state and federal aid received by Nueces county."

The trial court based judgment against appellant upon its conclusions of law that the contract in question was void for the following reasons:

First. Because it was awarded by the commissioners' court without advertisement and competitive bidding, and without exacting bond of appellant.

Second. Because it was "nothing more than a cost plus construction contract."

Third. Because the compensation paid and to be paid appellant for the services required of it under the terms of the contract "was so grossly excessive, unreasonable, and unconscionable as to constitute and amount to a legal fraud" upon the county.

[1] The second conclusion of law, that the contract "was in fact nothing more than a cost plus construction contract," has no support in the evidence, and is refuted by the facts set out in the conclusion itself. The contract had none of the elements of a "cost plus" transaction, and cannot be avoided upon that ground.

[2] A municipal corporation may exercise only such powers as are expressly granted it by statute, or those necessarily to be implied in or incident to the express grant, or are essential to the declared objects and purposes of the corporation. All such powers are conferred upon the corporation for public purposes only, and, since they may be exercised only in the public interest, the corporation can neither delegate nor cede nor barter them away so as to embarrass its legislative or governmental powers and disable it from the future performance of its public duties. And when the existence of a particular power is fairly or reasonably in doubt, the doubt must be resolved against the corporation. City of Brenham v. Water Co., 67 Tex. 542, 4 S. W. 143; Waterbury v. City of Laredo, 68 Tex. 565, 5 S. W. 81.

Under appropriate constitutional sanction (article 3, § 52, art. 11, § 2, Const.) the Legislature of Texas has delegated to the several counties of the state the power to lay out, construct, repair, maintain, and operate public roads in those counties, and to levy taxes, issue bonds, and appropriate moneys neces-sary to the proper exercise of those powers. Chapter 2, Title 18 (Chapter 3, Title 22, R. S. 1925), and Title 119 (Title 116, R. S. 1925) R. S. 1911. It is provided in section 18, art. 5, of the Constitution, that county commissioners composing the county commissioners' courts "shall exercise such powers and jurisdiction over all county business, as is conferred by this Constitution and the laws of the state," and under this grant of authority the Legislature has delegated to commissioners' courts the general power "to lay out, establish, change, and discontinue public roads and highways," and to "exercise general control and superintendence over all roads, highways, bridges, and ferries in their counties" (article 2241, R. S. 1911 [article 2351, R. S. 1925]), and to levy taxes for such purposes (Article 2242 [2352]). In addition to these general powers, commissioners' courts are given further and more detailed powers over the location, construction, maintenance, and operation of public roads, and the levying of taxes and issuance of bonds for the purposes of carrying out those purposes. Chapter 2, Title 18, and Title 119, R. S. 1911. The Revised Statutes of 1911 control in this case, except where amended prior to July, 1919, when the matters herein arose. The powers and duties of the commissioners' court of Nueces county are supplemented, but not substantially enlarged or diminished, by the provisions of the Nueces county road law. Sp. Laws, 35th Leg. p. 242. At least in a general sense it may be said that the provisions of Title 18, R. S. 1911, relate specifically to and govern the construction, maintenance, and operation of roads with funds derived from the sale of bonds therein provided for, while the provisions of Title 119 and of the Nueces county road law relate to and govern the laying out and opening of new public roads, and discontinuance of existing roads, out of funds provided by other means than those of the bond issues provided for in Title 18.

[3, 4] It is not deemed necessary to discuss in detail the provisions and effect of the statute cited, as counsel for both appellant and appellee have done with much ability in their respective briefs. It is sufficient to say, generally, that under constitutional sanction the Legislature has delegated to the counties of the state the power to locate, construct, maintain, and operate the public roads in the counties, and to provide within express restrictions the means to accomplish the powers granted, and that the commissioners' courts of the several counties shall have the authority to exercise those powers in behalf of the counties. In the exercise of this authority the commissioners' courts cannot go beyond the powers either expressly granted, or fairly or necessarily implied from the language of the grant, or which are essential to the declared objects of the grant, and, because the authority may be exercised only in the public

interest, it cannot be bargained away by the commissioners' court so as to materially hamper or embarrass the county in the full and free exercise of its legislative or governmental powers and duties. So, if the contract in suit cannot be squared to this rule, it is invalid and cannot be enforced.

Under the terms of the contract in controversy, appellant was employed by the county for the purposes, stated in the contract. The court below held that this employment constituted such "work" as is contemplated in the statute, which requires that contracts for work done by contract for a county must be awarded only in response to competitive bids therefor.

We are of the opinion that the record shows, by clear inference, that the contract was let by the commissioners' court, and entered into by appellant, with the definite design of evading the provisions of the statute relating to competitive bids and requiring contractors thereunder to give bond to secure the performance of their contractual obligations. And even if such design was not present, the evasion of the statute was nevertheless substantially effectuated. While appellant's charter does not seem to have been placed in evidence, and its purposes and powers under that charter are not definitely disclosed in the record, yet it is nevertheless apparent that it is simply a typical road contracting and construction company, of which so many are operating in this and other states at this time. Its whole organization, equipment, and facilities were created and are maintained for the purpose of constructing and maintaining improved highways and streets. There is no contention that it has, or is authorized under its charter to pursue or exercise, any other purposes or powers. Its professed and alleged efficiency in road building and maintenance constituted the whole consideration which moved the commissioners' court to employ its organization and facilities in the construction of the Nueces county highways. Its usual course of operation was through construction contracts. At the inception of the purpose of the county to enter into this program of road construction, appellant's officials, hearing of this purpose, considered bidding for the work in pursuance of the statutes, and to this end investigated the proposed project, and had it under consideration when the bonds were voted. They conferred with the county commissioners, but, instead of pursuing their earlier intention of bidding for the work, advised the commissioners against undertaking the improvement through construction contracts to be awarded upon competitive bids, advised them to do the work themselves at the direct expense of the county, and offered appellant's organization and facilities to organize, supervise, and operate the construction program. Appellant would not enter in-

to a competitive bidding contest for the work, or undertake it upon its own responsibility or risk or expense, under penalty of the bond required by law, but it proposed, and the commissioners agreed to, the alternative of constructing the roads and doing all the things that would have been required of it under the ordinary construction contract obtained under the competitive bidding statute, but without assuming any of the responsibilities, financial risks, or other liabilities resting upon them under such contracts, without giving bond as a guaranty of good faith performance as required in that statute, and without having subjected the reasonableness of the compensation, arbitrarily fixed by it to the test of competitive bidding, as contemplated in that statute.

The whole spirit of the times, crystallized in the statutes and favored in the decisions construing those statutes, is to require public authorities empowered to expend public funds to award contracts for such expenditures only after notice and upon competitive bids. It would be subversive of that spirit, and in contravention of those statutes so construed, to give effect to the subterfuge resorted to in this transaction for the purpose of evading the law, and this court declines to lend its aid to that purpose.

Contracts calling exclusively for the personal employment of attorneys, physicians, architects, and other persons, because of their peculiar scientific knowledge or professional skill, ability, training or efficiency, are held not to be within the contemplation of the statute requiring the awarding of contracts through competitive bids. This doctrine seems to have been first definitely established in this state in the case of Hunter v. Whiteaker & Washington, 230 S. W. 1096, decided by this court through an opinion by Chief Justice Fly, and in which writ of error was denied by the Supreme Court. That decision and the controlling holding appears to have been expressly approved by the Commission of Appeals in Tackett v. Middleton, 280 S. W. 563, 44 A. L. R. 1143, and by other Courts of Civil Appeals in the cases of Gibson v. Davis, 236 S. W. 202, Harper v. Thompson, 280 S. W. 861, Roper v. Hall, 280 S. W. 289, Wallace v. Commissioners' Court, 281 S. W. 593, and may be regarded as settled law in this state, notwithstanding the prior and apparently contrary holdings in Ashby v. James (Tex. Civ. App.) 226 S. W. 732, and Limestone County v. Knox (Tex. Civ. App.) 234 S. W. 131.

The theory upon which the doctrine rests is that the competitive bidding statutes cannot be rationally or practically applied to contracts for the employment of architects or other persons whose services are required because of the special training, skill, and scientific or technical knowledge necessary to the object to be accomplished through that

employment. The value of such services is not to be measured by a mere matching of dollars, so to speak; it is not to be determined upon the irrational assumption that all men in the particular class are equally endowed with technical or professional skill, knowledge, training, and efficiency, nor are such services rendered more desirable because offered more cheaply in a competitive bidding contest. The selection of a person to perform services requiring those attributes calls for the exercise of a wise and unhampered discretion in one seeking such services, for it involves not only those attributes, but the qualities of reputation and personal and professional trustworthiness and responsibility as well. The services of the person selected cannot be squared to, nor his accomplishment circumscribed by nor forced and expanded to fill, specific measurements, as in cases of contracts for construction, where the service is to be performed and may be required to be done by accurately ascertainable and designated standards, with specific materials, and in accordance with prescribed plans and minutely detailed specifications; the nature and mode of performance of the services to be done in the employment under the excepted contract are such as to be determinable largely by the professional or scientific person so employed. His performance and accomplishment thereunder must depend also entirely upon his own initiative, skill, knowledge, training, experience, and discretion, free from the interference or dictation of the employer as to the methods, systems, processes, or theories to be used in effecting the ultimate object of the employment. Obviously, it would be absurd to construe the statute to mean that contracts for such services shall be let only to the lowest bidder in a competitive bidding contest.

[5] Now, it is contended by appellant that this was such a contract, and that therefore it should be excepted from the operation of the competitive bidding statute. We overrule this contention. The statute does not by its terms except any sort of contract from its operation, but the exceptions mentioned have been created only by judicial construction in deference to the doctrine declared upon in the case of Hunter v. Washington, supra. We think that doctrine has been extended to the full measure of its usefulness, and ought not to be applied except in cases of clear applicability. This is not such a case. Road construction and street paving does not constitute a profession or science; it is an industry, albeit a most valuable and useful one, to which our state and the public owe much in the onward march of progress. And while it, of course, involves the services of those who are skilled and are possessed of the technical knowledge employed in some of the aspects of the business, those peculiar services are only incidental and subordinate to the executive forces of the industry. In performing the obligations imposed upon them under that character of contracts to which they are restricted under the statute, road contractors are not required to furnish legal, medical, architectural, or other professional services to the county, nor were they required to do so under the contract in suit, except to furnish such engineering skill as their local superintendent possessed, and he was subject in all things to the orders of the county commissioners, and restricted to detailed plans and specifications prepared by the county engineer. All skill and knowledge which appellant devoted to the work was exercised under the directions of the commissioners and in accordance with mandatory plans and specifications furnished it by the county engineer; appellant was given no discretion to exercise any scientific or professional service it may have brought to the employment, nor any power to enforce its judgment, processes, methods, systems, or theories. Its services were wholly subordinate and were wholly without the class excepted by judicial construction from the competitive bidding statute. Nor were those services brought into that class by appellant's obligation in the contract to advise and counsel the commissioners generally in the practical management and operation of the road project, or to advise them what materials and equipment to purchase and use, or where or from whom to purchase them, or in employing laborers and foremen, or organizing and supervising the man power used in the program. The contract had none of the elements which could properly bring it into the excepted class, and could not be lawfully awarded except upon competitive bid.

[6] So we are of the opinion that the compensation allowed appellant under the contract was "so grossly excessive, unreasonable, and unconscionable as to constitute a legal fraud on the county of Nueces and to render said contract void and unenforceable," as the trial court concluded. The service undertaken by appellant was essentially subordinate in all its aspects. It was subject at all times and in every detail to the direction of the commissioners' court, and limited in its practical operation to the plans and specifications laid down by the county engineer. Appellant was given no discretion except such as it might exercise in advising and counseling the court upon the whole project and in the detail operations. It exercised no final power. It invested no money, assumed no risks of loss, incurred no liabilities whatever. It was under no bond for faithful performance of its obligations. It incurred no direct expense or financial obligation, except to pay the local engineer which it kept on the work at a salary of $250 a month, and to pay the personal expenses incurred by its president and general superintendent in their occasion-

al visits to Corpus Christi. The whole of its financial outlay during the first division of the program amounted to only $9,629.81. Under the contract, it was paid $50,287.45 for those services during that period. Its net profit therefore was $40,657.64. It claimed in its pleadings below that if it had been permitted by the county to continue in its employment through the second division of the work, the balance of its gross compensation would have been $60,000, that in earning this amount it would have expended only $7,500, and that its net profit therefore would have been $52,500, and under the evidence it claimed and still claims its net profit would have exceeded $29,000. The trial court found that appellant's net profit in this second division of the work would have been only $27,598.38. This is but a general outline of the facts upon which the trial court held against appellant upon this issue concerning which there is a great mass of evidence in the record. As a practical matter, the services required of appellant and performed by it 'were in the main only such as could be, and were in fact, performed by a subordinate civil engineer employed therefor by appellant at a salary of $250 a month, whereas, the county was required under the contract to pay, and did pay, appellant the sum of $2,285.77 a month during the period the contract was in effect. It is true that, in addition to the services of the engineer, appellant's president and its general superintendent made occasional visits at appellant's expense, to Corpus Christi, and there conferred, advised, and counseled with the commissioners about the project. For this service they received $2,037.77 a month, after deducting the amount paid their local superintendent; or more than four times as much as the county paid its county highway engineer, whose services and duties were thereby duplicated.

These profits were completely assured appellant under the contract. They were as certain to accrue to appellant as that the county's bond money was to be expended. On the other hand, appellant assumed, could incur, no risk, no liability, no financial obligation, except to pay its local superintendent's salary. It did not incur the obligation of even a bond to guarantee its performance. We uphold the trial court's finding and conclusion that the compensation provided for appellant in the contract was so grossly excessive, unreasonable, and unconscionable as to constitute a legal fraud upon the county, whereby the contract is vitiated.

[7] In entering into the contract, the commissioners' court exceeded its powers in another and even more deeply fundamental respect. Under the law, the commissioners as a court had the option of expending the bond money in the construction of improved roads either by directly and upon their own responsibility employing the labor, furnishing the facilities, equipment, and materials, and supervising the work through the agencies provided by statute, or by having the work done by others under contract awarded upon competitive bids. In the exercise of this option the commissioners elected to do the entire work themselves, but separated the project into two divisions, the first division to be done with the proceeds of the sale of series B of the bonds, amounting to $1,000,000, to be followed with the second division, to be done with the proceeds of the sale of series C of the bonds, amounting to $900,000, which sale was accordingly ordered postponed, and was in fact postponed, until the first ,$1,000,000 was expended. The work was inaugurated under this plan, which embraced the contract with appellant. When under that contract the supervision of the work was yielded to appellant, and by reason thereof, the county was cut off from the aid which it would have received from the state under its Highway Code, and so long as that plan was pursued the county was thereby cut off from the privilege and the higher duty of having the work done by contract awarded to the lowest and best bidder therefor. It experimented with the plan of doing the work itself.

The experiment failed of the best results. It proved to be more expensive than was anticipated, that the plan first adopted was subversive of the public interest, and that if persisted in the public funds voted by the people for the specific purpose would be expended without accomplishing the object for which they were voted. It proved a bar to the procuring of state aid in the sum of $600,000, which fund, but for the contract, had become available to the county. By the time the first part of the road program was completed by reason of the expenditure of the first $1,000,000, the commissioners' court, then aware of the conditions stated, realized the failure of the experiment, and that the best interest 'of the public required the abandonment of the original plan and the adoption of the alternative of having the remaining work done by contract for its construction, under the competitive bidding statute, whereby they would not only secure more benefits from the funds to be derived from the sale of the remaining bonds, but that those funds would be augmented by an appropriation of $600,000 from the state highway funds: instead of a fund of only $900,000, they would have an available fund of $1,500,000. This state of facts does not show, merely, that the commissioners' court had adopted an unwise plan and made an improvident contract with appellant, for if that were the only effect it would have constituted no valid reason for abrogating the contract; it goes further and shows that by making that contract, which is exclusive in its nature, the commissioners' court tied its own official hands and bargained away the coun-

ty's legislative and governmental powers, whereby it was disabled from performing its duties to the public. The county had the primary power, exercisable at any time, to have all or any part of its road system done under contracts expressly authorized by statute, and it had no authority to enter into any exclusive contract whereby that power and the right to exercise it was abridged or ceded away. The contract, having that effect, was invalid as a matter of law, and was therefore unenforceable. City of Brenham v. Water Co., 67 Tex. 542, 4 S. W. 143; Waterbury v. City of Laredo, 68 Tex. 565, 5 S. W. 81. And all persons dealing with the commissioners' court of a county do so with notice of this limitation upon the court's power to bind the county.

It is not intended by these conclusions to hold that by exercising such powers a county may abrogate any and every existing contract with others, for that is not the case. The county may not abrogate any contract which it has fairly made under express, or necessarily or fairly implied, authority of the statute. Only contracts which are fundamentally without authority of law may be thus abrogated. And this was such a contract.

[8] There is also in the case the question of the power of the county commissioners' court to bind their successors in office to a contract of this nature, it appearing that the employment of appellant extended beyond the term of the commissioners then in office, and that at the intervening election two of the commissioners were superseded by others. It was the court thus subsequently formed that terminated the contract and seeks in this suit to enforce the cancellation. There is no occasion here to enter into any lengthy discussion of the question presented. We are of the opinion, however, and we so decide, that because of the personal nature of the employment, which was induced largely if not entirely by the confidence the individual members of the first court had in the officials of appellant corporation, the contract of employment was not binding upon the court beyond the terms of the contracting commissioners, whose successors might not be subject to the personal considerations which influenced their predecessors.

[9, 10] The trial court held that the contract was void, and that the county would be entitled in its cross-action therefor to recover the amounts paid appellant under that contract, but for the bar of the statute of 2 years' limitation, which the court held to be applicable. In its cross-assignments of error appellee attacks this holding of the court, contending that limitation does not run against counties as to causes of action of this nature. The settled rule seems to be that counties are not exempt from the operation of statutes of limitation in matters arising out of the ordinary business affairs of the county, but are exempt as to causes of action accruing to the corporation in its public or governmental capacity, or while acting for and as an instrumentality of the state. Delta County v. Blackburn, 100 Tex. 51, 93 S. W. 419. We think it quite clear that the cause of action asserted by the county in this case falls in the latter class. The cross-action presented by the county was to recover money unlawfully paid out by the county from public funds derived from the sale of bonds voted by the people and issued and sold for the purpose of constructing and maintaining public highways, some of which constituted and had been expressly designated as parts of the state highway system. These were public funds obtained for a purely public purpose, and were held by the county in its capacity as trustee for the public. In constructing and maintaining these highways the county was exercising a purely public, governmental function, as an instrumentality of the sovereign, in which reposes the power as well as the primary duty of maintaining the highways of the state, and in which the state has a proprietary as well as supervisory interest. In addition to the Delta County Case, we adopt some of the other authorities cited by appellee: 37 C. J. 715; 5 McQuillan Mun. Corp. § 2489; Johnson v. Llano County, 15 Tex. Civ. App. 421, 39 S. W. 995; Ward v. Marion County, 26 Tex. Civ. App. 361, 62 S. W. 557, 63 S. W. 155; American Surety Co. v. Trustees (Tex. Civ. App.) 224 S. W. 292; Harris County v. Charlton, 112 Tex. 19, 243 S. W. 464, 245 S. W. 644; Comanche County v. Burks (Tex. Civ. App.) 166 S. W. 470; McKenzie v. Hill County (Tex. Civ. App.) 263 S. W. 1073. On these authorities we hold that the statutes of limitation do not operate against the county in this case, and as the contract under which the payments were made by the county to appellant was void, and as the payments thereunder were therefore unlawfully made, the trial court erred in not rendering judgment in behalf of the county for the amounts so paid.

It is ordered that the judgment denying recovery to appellant be affirmed, that the judgment denying recovery to appellee upon its cross-action be reversed, and that judgment be here rendered in favor of appellee upon its said cross-action, with all costs incurred in the litigation.

Affirmed in part, and in part reversed and rendered.