**RIO GRANDE VALLEY GAS CO., et al., Appellants,**

v.

**The CITY OF EDINBURG, Texas, Appellee.**

**No. 13–98–630–CV.**

Court of Appeals of Texas, Corpus Christi.

Dec. 21, 2000.

206

Christina Carlson Dodds, Austin, Eduardo R. Rodriguez, Rodriguez, Colvin & Chaney, Brownsville, Cynthia Keely Timms, Dallas, Sara Murray, Soules & Wallace, San Antonio, Daniel Bishop, Watson, Bishop, London & Galow, Austin, Jerry K. Clements, Locke, Purnell, Rain & Harrell, Paul D. Andrews, Soules & Wallace, San Antonio, E. Lee Parsley, Locke Liddell & Sapp, Austin, Luther H. Soules, Iii, Soules & Wallace, San Antonio, Reagan Wm. Simpson, Fulbright & Jaworski, Houston, for appellants.

David C. Garza, Garza & Garza, Brownsville, Jennifer Bruch Hogan, Hogan, Dubose & Townsend, Benjamin L. Hall, III, Elizabeth B. Hawkins, O'Quinn & Laminack, Robert M. Roach, Cook, Roach & Lawless, Houston, Dana Livingston Cobb, Cook, Roach & Lawless, Austin, J.A. 'Tony' Canales, Canales & Simonson, P.C., Corpus Christi, Russell S. Post, Hogan, Dubuse & Townsend, Houston, for appellee.

Before Justices HINOJOSA, CHAVEZ and RODRIGUEZ.

## OPINION

CHAVEZ, Justice.

Appellants [1] supplied natural gas to commercial and residential customers within the city of Edinburg. Some of that gas was sold and distributed according to the terms of a 1985 franchise granted by the city for the right to sell and distribute natural gas within the city in exchange for a 4% fee to be charged on all natural gas sales. In 1996 the city sued appellants, alleging that they had used various means to evade the 1985 franchise agreement. After a lengthy trial, the jury was asked to answer questions regarding breach of contract, fraud, tortious interference with contract, civil conspiracy, "single business enterprise" and fraudulent use of distinct corporations, and whether the property of certain appellants constituted a purpresture. Based on the jury's verdict, judgment was entered awarding the city $6,586,508.69 in actual damages (including prejudgment interest),[2] $3,518,000 for trial and conditional appellate attorney's fees, $300,000 in exemplary damages, post-judgment interest, and costs. We affirm the city's recovery of lost franchise fees and the award of attorney's fees, but we remove the damages award for the value of certain lateral pipelines and the award of exemplary damages. As reformed, we render judgment that the city recover $774,445.33 in actual damages (including pre-judgment interest), plus $3,518,000 for trial and conditional attorney's fees.

For purposes of appeal, the appellants have formed five groups which have each filed separate briefs, raising dozens of is-

sues. Rather than attempting to summarize the positions of the parties, we will first provide a factual overview, and then proceed to examine the parties' complaints and positions regarding each of the dispositive issues.

### Factual Overview

Effective October 1, 1985 the city entered into a franchise agreement with Rio Grande Valley Gas Co. (RGVG), granting RGVG the "right, privilege, and franchise" to supply natural gas to customers within the city limits. In exchange for this franchise, RGVG was to pay the city "4% of its gross income derived from all gas sales within the City of Edinburg." In 1993, RGVG merged with Southern Union Gas Co. (SU), and SU assumed the franchise.

RGVG was a subsidiary of Valero Energy Corp. (VEC). RGVG obtained most of its natural gas supply from Valero Transmission Co. (VTC), at a set price which RGVG then offered to its customers at a set price. The prices for consumers were regulated and set by tariffs approved by the Railroad Commission. The market price, however, was much lower, and large industrial customers began clamoring for cheaper gas than was available at RGVG's set rate. In 1986 Reata Industrial Gas Co. (Reata), another subsidiary of VEC, began selling deregulated "spot-market" gas, which fluctuated in price according to the market price, to industrial customers in Edinburg. Eventually other companies in addition to Reata began supplying spot-

1. Although both the plaintiffs at trial and the defendants at trial appealed from the trial court's judgment, most of this opinion concerns issues raised by the defendants at trial, Rio Grande Valley Gas Co., Valero Energy Corp., Valero Transmission Co., Reata Industrial Gas, L.P., Southern Union Gas Co., Mercado Gas Services, Inc., Valero Natural Gas Co., Valero Gas Marketing Co., and Reata Industrial Gas Co. When the term "appellants" is used in this opinion, that term refers

to the parties who were defendants at trial. When this opinion addresses the issues raised by the city of Edinburg in its appeal, it will be referred to simply as "the city."

2. Different appellants are liable for different amounts. The figures given in the introductory paragraph are cumulative figures for all of the appellants.

market gas to large industrial customers in Edinburg, but this case deals primarily with Reata's spot-market sales.

Reata owned no pipes for delivering gas, so they contracted with VTC and RGVG for "transportation" of the gas to industrial customers. On paper, Reata's sales took place at designated points of sale outside of the city limits. However, there were no meters at these designated points, and the gas was not metered until it arrived at the customers' premises inside the city limits.

In 1986 Richard Alamia, then mayor of Edinburg, sent a letter to the commissioners of the Railroad Commission supporting the availability of spot-market gas, and mentioning the benefits to the city of permitting RGVG to purchase some of its gas from Reata. Edinburg was also a participant in the "Valley Steering Committee," an organization of cities in the region which addressed issues concerning natural gas supply, including deregulated spot-market gas. In January 1988 the city adopted an ordinance approving the rate RGVG could charge for transporting gas within the city. The city also adjusted its budget to reflect lower anticipated revenue from gas franchise fees after Reata began supplying the large industrial customers with spot-market gas.

In March 1987 RGVG also transferred certain "lateral" pipelines to VEC. Most of these pipes lay outside the city limits. However, a small portion were inside the city. The city contends that its franchise agreement prohibited such a transfer without its approval, and that under the franchise agreement the city was authorized to purchase the assets to be transferred if such a situation arose.

### Single Business Enterprise & Sham to Perpetrate Fraud

■ The jury found that RGVG, VEC, VTC, VNGC, and Reata operated as a single business enterprise between October 1, 1985 and September 30, 1993. Based on this finding, these appellants were held jointly and severally liable for the actual damages assessed against each. The jury also found that VEC was responsible for the conduct of RGVG during that same time period because VEC used RGVG to perpetrate a fraud on the city. Appellants make several arguments contesting these findings.

■ First, we consider appellants' argument that the only theory of collective liability pleaded by the city was "alter ego," and that the city never pleaded "single business enterprise" or "sham to perpetrate a fraud." In order to support recovery, a petition is required to contain "a short statement of the cause of action sufficient to give fair notice of the claim involved." Tex.R.Civ.P. 47(a). The test of the "fair notice" pleading requirement is whether an opposing attorney of reasonable competence, with the pleadings before him, can ascertain the nature and basic issues of the controversy and what testimony will probably be relevant. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896–97, 2000 Tex. LEXIS 88, at *23 (Tex.2000); *see* Tex.R.Civ.P. 45(b).

■ The "single business enterprise" theory is described as analogous to partnership principles: that when corporations are not operated as separate entities, but rather integrate their resources to achieve a common business purpose, each constituent corporation may be held liable for the debts incurred by the other component entities in pursuit of that business purpose. *Paramount Petroleum Corp. v. Taylor Rental Ctr.*, 712 S.W.2d 534, 536 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.). Factors relevant to determining whether a "single business enterprise" is present include common employees,

common offices, centralized accounting, payment of wages by one corporation to another corporation's employees, common business name, services rendered by the employees of one corporation on behalf of another corporation, undocumented transfers of funds between corporations, and unclear allocation of profits and losses between corporations. *Hall v. Timmons,* 987 S.W.2d 248, 252 (Tex.App.—Beaumont 1999, no pet.); *Beneficial Personnel Servs. of Tex., Inc. v. Rey,* 927 S.W.2d 157, 165 (Tex.App.—El Paso 1996, joint writ granted without reference to merits, remanded for settlement); *Paramount,* 712 S.W.2d at 536. To prove that there has been a sham to perpetrate a fraud, tort claimants must show only constructive fraud. *Castleberry v. Branscum,* 721 S.W.2d 270, 273 (Tex.1986). Constructive fraud is the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests. *Archer v. Griffith,* 390 S.W.2d 735, 740 (Tex.1964).

■ The city's live pleading alleged alter ego and "joint enterprise liability" as "alternative" theories. To establish a "joint enterprise," a party must show (1) an agreement among the members of the group; (2) a common purpose; (3) a community of pecuniary interest; and (4) an equal right to control the enterprise. *Shoemaker v. Whistler's Estate,* 513 S.W.2d 10, 17 (Tex.1974), citing RESTATEMENT (SECOND) OF TORTS § 491 cmt. c, (1965).

■ The "alter ego" theory applies to disregard the corporate fiction when the corporation is "organized and operated as a mere tool or business conduit of another corporation." *Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 198 (Tex.1995). "Alter ego" is a separate and distinct theory from the concept of a "single business

enterprise." *Aluminum Chemicals (Bolivia), Inc. v. Bechtel Corp.,* 28 S.W.3d 64, 68, 2000 Tex.App. LEXIS 5188, at *7–8 (Tex.App.—Texarkana 2000, no pet. h.); *George Grubbs Enters., Inc. v. Bien,* 881 S.W.2d 843, 859 (Tex.App.—Fort Worth 1994), *rev'd on other grounds,* 900 S.W.2d 337 (Tex.1995); *Hideca Petroleum v. Tampimex Oil Int'l, Ltd.,* 740 S.W.2d 838, 843 (Tex.App.—Houston [1st Dist.] 1987, no writ).

Specifically, the city's petition alleged that "Defendants acted jointly to conduct the unauthorized deliveries of gas inside Edinburg" and that "the Valero Defendants acted through Reata and RGV to prosecute their own interests and that Reata and RGV were little more than pawns used to effectuate the desires of the Valero Defendants." The city also alleged that "Valero Energy used Valero personnel and the Valero Defendants to transact supposed 'arms-length transactions' on behalf of and to the benefit of Valero Energy's common interest," and "utilized sham agreements ... to promote this sham." Finally, the city alleged that "Valero Energy and the Valero defendants ... conducted a joint enterprise to supply, transport, sell, and/or deliver gas inside the City of Edinburg."

The city's pleadings gave appellants fair notice of its claim of "sham to perpetrate fraud" and single business enterprise. The city alleged that appellants had used their various corporate forms as a deceptive "sham." The city also alleged that the different corporations were not operated as separate entities, but rather were used "on behalf of and to the benefit of Valero Energy's common interest," and that the subsidiary corporations were used as "pawns." Even if the city did not use the phrases "sham to perpetrate fraud" and "single business enterprise" in its plead-

ings, the facts alleged support those causes of action.

Support for this holding is found in *Klein v. Sporting Goods, Inc.*, 772 S.W.2d 173 (Tex.App.—Houston [14th Dist.] 1989, writ denied). In that case, the jury found that the defendant had used the corporate form as a sham to perpetrate fraud on the plaintiffs. *Id.* at 175. The plaintiffs' pleadings did not use the phrase "sham to perpetrate fraud," but did allege that the defendant had acted deceptively and used the corporate form in an attempt to conduct business while avoiding legitimate debts. *Id.* at 177. The court held that the plaintiffs' pleadings gave the defendant adequate notice of the nature and basic issues of the cause of action. *Id.*

Appellants also argue that the "single business enterprise" doctrine is not recognized in Texas law as a valid means of disregarding the corporate form. This argument is without merit. Numerous Texas cases have upheld jury findings on a "single business enterprise" theory. *See, e.g., Fontenot Petro–Chem & Marine Servs., Inc. v. LaBono*, 993 S.W.2d 455, 460 (Tex.App.—Corpus Christi 1999, pet. denied); *Hall*, 987 S.W.2d at 252; *Paramount Petroleum*, 712 S.W.2d 534 at 536.

■■■ Next, appellants argue that the city could only seek to hold one corporation liable for the debts of another after showing that it would be harmed if forced to seek collection of a judgment from only one defendant. Again, we disagree. Both of the cases relied on by appellants, *Lucas v. Texas Industries, Inc.*, 696 S.W.2d 372 (Tex.1984), and *Mancorp, Inc. v. Culpepper*, 836 S.W.2d 844 (Tex.App.—Houston [1st Dist.] 1992, no writ), applied the alter ego doctrine, which is not at issue in this case. The prospect that a claimant will not be able to collect a judgment unless the corporate form is disregarded is part of the justification for doctrines such as alter ego and single business enterprise. *See Lucas*, 696 S.W.2d at 374; *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 228 (Tex.1990). That does not mean, however, that a claimant may not pursue theories for piercing the corporate veil at the same time that basic liability issues are litigated. Countless Texas cases, including the landmark Texas Supreme Court decision in *Castleberry v. Branscum*, allow claimants to litigate underlying liability issues at the same time and in the same proceeding as veil-piercing theories. *See, e.g., Castleberry*, 721 S.W.2d at 271; *see also Mancorp*, 802 S.W.2d at 227.

Appellants also contend that the city presented insufficient evidence to support an alter ego finding. Because the jury was presented with questions regarding single business enterprise and sham to perpetrate a fraud, but *not* alter ego, this point is moot.

■■■ Next, we consider appellants' challenges to the testimony of the city's expert on corporate structures, Marlane Meyer. Appellants contend that Meyer's testimony was inadmissible because the city failed to meet its burden of establishing that Meyer was qualified to give expert testimony about the matters she testified about, and that her testimony satisfied the standards for reliability and relevancy of expert testimony.

■■■ The proponent of expert testimony has the burden of establishing that the expert is qualified in the field, the testimony is relevant to the issues in the case and is based on a reliable foundation. *E.I. du Pont de Nemours and Co., Inc. v. Robinson*, 923 S.W.2d 549, 556 (Tex.1995). In assessing the reliability of scientific testimony, courts consider factors such as (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective inter-

pretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses which have been made of the theory or technique. *Id.* at 557. However, this list of factors for assessing the reliability of scientific evidence cannot always be used with other kinds of expert testimony. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998). In some cases, the *Robinson* factors will not be helpful in assessing the reliability of the expert's testimony; rather, simple observation and experience in the field may suffice. *Id.* We review the trial court's decision regarding whether to admit expert evidence according to an "abuse of discretion" standard. *Id.* at 727.

Regarding Meyer's qualifications, appellants argue that Meyer works as a probate and estate planning lawyer who "admitted to having no experience with, expertise in, training for, or publications regarding corporate structure issues involving the natural gas industry, multi-tiered business entities, municipal franchises, or fraud." However, she did testify that she practiced primarily corporate law for the first 10–12 years of her 22 year legal career, and had represented approximately one hundred corporations. At the time of trial, 20–25% of her work was still in corporate law. She acknowledged that she had never represented a corporation in the natural gas business or a publicly held corporation. While she had set up multi-tiered corpora-tions, she had not worked with any multi-tiered corporations the size of the Valero corporations. She had been involved in litigation involving alter ego issues before, and regularly advised clients about how to preserve the liability protections of the corporate form. She had never published any articles in the corporate law field. Corporate law was not included as one of her practice areas in her entry in the *Texas Legal Directory*, but Meyer testified that this was because she did not want referrals in that field. She testified that she was not a member of the corporate law section of the State Bar because she considered the section newsletter to be the principal benefit of membership and her law partner *was* a member of the corporate law section, so she had access to his copy of the newsletter.[3]

Appellants rely on *Broders v. Heise*, 924 S.W.2d 148, 152–53 (Tex.1996), a case where the Texas Supreme Court held that an emergency room doctor was not qualified to testify about the specialty of neurology. Appellants argue that Meyer, as an estate and probate lawyer, was not qualified to testify about corporations. However, unlike the emergency room doctor in *Broders*, Meyer had once concentrated her practice in the specialty she was testifying about, and continued to do a portion of her work in that field. Therefore, *Broders* is not controlling.

We conclude that the trial court did not abuse its discretion in determining that Meyer was qualified as an expert in corporate structures. Furthermore, the subject of Meyer's testimony was not particularly scientific, and, therefore, the *Robinson* fac-

---

3. After testimony was closed, appellants sought to introduce into evidence a document to show that Meyer's partner was *not* a member of the corporate law section, and therefore would not receive its newsletter. This document was not admitted into evidence, and entered the record only as a bill of excep-tions. Because the document was not admitted into evidence and was never before the jury, we may not consider this document in our review of the sufficiency of the evidence. Appellants do not refer to this document or raise any complaint related to it in their appeal.

tors for admissibility of scientific evidence cannot be usefully applied in assessing the reliability of her testimony. Rather, Meyer's testimony was based on her experience creating and organizing corporations. We hold that the trial court was also within its discretion in determining that Meyer's testimony was relevant and reliable.

Appellants also contend that Meyer's testimony constituted · "no evidence" because her opinions consisted primarily of improper legal conclusions. An expert may not give an opinion regarding a question of law, because such issues are not for the factfinder to determine. *Puente v. A.S.I. Signs*, 821 S.W.2d 400, 402 (Tex.App.—Corpus Christi 1991, writ denied). However, an expert may testify to ultimate issues which are mixed questions of law and fact. *Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 365 (Tex. 1987).

Meyer's testimony consisted primarily of interpretation of various corporate documents from VEC and its subsidiaries. Meyer also offered opinions regarding the degree to which these documents indicated that VEC and its subsidiaries were being operated as one unit rather than as separate entities. To the extent that Meyer commented on ultimate issues, those ultimate issues were sufficiently mixed with questions of fact to permit admission of her testimony.

Appellants also argue that the judgment improperly incorporated the jury's answers to questions 11 and 12 regarding single business enterprise and whether VEC used RGVG to perpetrate a fraud, because the city elected not to include in the judgment the jury's answer to question 5 regarding whether RGVG failed to make payments under the franchise agreement, and the jury charge instructed the jury that its consideration of questions 11 and 12 was premised on an affirmative answer to question 5. Appellants argue that, because disregarding corporate separateness is a "secondary" theory of recovery, the city was obligated to obtain a "secondary" finding justifying disregarding corporate separateness for each cause of action it would ultimately recover on.

We disagree. There is simply no basis in law for requiring the city to obtain separate single business enterprise findings for each cause of action. Rather, the single business enterprise finding in question 12 applies to all causes of action. *Cf. Aero Energy, Inc. v. Circle C Drilling Co.*, 699 S.W.2d 821, 823 (Tex.1985) (alter ego finding applied to both causes of action for breach of contract and fraud).

VEC and its subsidiaries contend that the purchase of RGVG by SU on October 13, 1993, transferred all liability for RGVG's actions to SU and absolved VEC and its subsidiaries. However, the jury made findings that authorized disregarding the separateness of the various Valero corporations, and we have rejected all of appellants' challenges to these findings. Therefore, liability for RGVG's conduct was not limited to RGVG, but extended throughout the Valero corporate family.

Finally, appellants contend that, because they became parties to this lawsuit at different times, those who were added later (Valero Transmission, L.P.; Reata; Reata, L.P.; and Mercado) should not be jointly responsible for costs incurred before they became parties to the suit. Here again, because the jury's findings authorized disregarding the corporate separateness of the Valero appellants, sharing of costs between them was appropriate.[4]

---

**4.** The jury's finding disregarding the corpo- rate separateness of the Valero defendants is

We conclude that appellants have failed to demonstrate error in the trial court's determination that VEC, RGVG, VTC, VNGC, and Reata are jointly and severally liable for the damages assessed against them.

### Contract Claims

Questions were submitted to the jury regarding breach of contract and tortious interference with contract. The jury answered each question in the city's favor, and appellants challenge the evidence supporting each of these answers.

The city contended that appellants committed a breach of contract by failing to pay full franchise fees under the franchise agreements and by transferring the lateral pipelines without the city's consent. The city also alleged that the transfer of the lateral pipes constituted tortious interference with the franchise agreement by the grantees of the lateral pipelines.

Appellants contend that only RGVG was a party to the franchise agreement, and therefore there was no obligation to pay franchise fees on the spot-market gas sold by Reata. However, because we have held that the separateness of the various Valero subsidiaries should be disregarded, the contractual obligations of the franchise agreement extend throughout the Valero family, and the Valero appellants were responsible for collecting and paying franchise fees on all Valero gas sales inside the city, whether the gas was nominally sold by RGVG or by Reata.

■ Appellants contend, however, that the Reata spot-market sales were made outside the city limits, with RGVG/SU providing only transportation service of the gas to customers inside the city limits.

The city contends that the point of sale designation for these sales outside the city limits was a sham, and that these sales should be considered as made inside the city limits.

John Brickhill, an expert on the gas industry called to testify by the city, testified that the critical factor for determining where gas should be considered to be sold is where the gas is metered. In this case, the spot-market gas sold to the large industrial customers was not metered until it arrived at the customer's premises inside the city limits. Furthermore, for the first few years the industrial customers were provided with spot-market gas, they were charged only one fee for their gas, not a separate fee for purchase of the gas outside the city limits and a separate fee for transportation inside the city limits to their premises. According to Brickhill, the arrangement whereby the gas would be considered sold outside the city limits was "just an accounting gimmick" and "a sham." He concluded that the spot-market gas should be considered to be sold inside the city limits and, therefore, subject to the franchise fee.

■ Appellants argue that the points of delivery outside the city were established by unambiguous contracts between Reata and the large industrial customers. However, Brickhill testified that these contract provisions were a sham. Such evidence may negate even unambiguous contract provisions. *King v. Fordice,* 776 S.W.2d 608, 610 (Tex.App.—Dallas 1989, writ denied) (evidence is admissible to show that a writing which apparently constituted a contract was a sham and never intended to constitute an enforceable agreement) (citing Sweet, *Contract Making and Parol Evidence: Diagnosis and*

---

without effect to Mercado, which is not part of the Valero corporate family. However, because we determine in this opinion that the city was not entitled to recover damages from Mercado, Mercado has no responsibility for any costs.

*Treatment of a Sick Rule,* 53 CORNELL L.REV. 1036, 1039 (1968); and 2 R. RAY, LAW OF EVIDENCE (Texas Practice 3d ed.) § 1661 (1980)); *see Tarrant County Water Control and Improvement Dist. Number One v. Fullwood,* 963 S.W.2d 60, 64 (Tex. 1998) (contract will not prevent existence of master-servant relationship where contract is mere sham to conceal the true legal relationship between the parties).

Appellants also argue that, because Reata did not own any pipes inside the city, it had no choice but to contract for transportation services inside the city limits. However, the fact that Reata had to contract for some other company to transfer the gas is irrelevant to the issue of where title to the gas transferred from Reata to the customers. RGVG/SU, the transporter of the gas, never assumed title. The involvement of RGVG/SU to transport the gas in no way necessitated that title transfer to the customers before it arrived at the customers premises. We conclude that, based on Brickhill's testimony, the jury could have determined that Reata's spot-market gas sales occurred inside the city limits. Because the evidence was sufficient to support disregarding the corporate separateness between Reata and RGVG, the obligation to pay franchise fees extended to the spot-market gas "sold" by Reata and "transported" by RGVG to customers inside Edinburg.

■ However, the same reasoning does not apply to gas transported by SU. SU has no corporate affiliation with Reata or the other Valero corporations. While the city presented evidence that the arrangement by which gas was "sold" by one Valero subsidiary (Reata) and "transported" by another (RGVG) was merely a "sham" to avoid franchise fees, the same analysis does not apply when the transporter is outside the corporate family. So long as RGVG was the franchisee, the obligation to pay a franchise fee extended to sales by Reata inside the city limits. When SU became the franchisee, this obligation ended.

■ The city argues that, because SU made it possible for Reata and other spot-market sellers to sell gas to customers inside the city, those other sellers were SU's "assignees" under the franchise agreement. However, even if we accept the city's argument that the spot-market sellers were "assignees" of the franchise agreement, such a holding would impose a duty to pay franchise fees onto the spot-market sellers themselves, not onto SU. The city's attempt to make SU responsible for the sales of its alleged assignees is not supported by the franchise agreement. The franchise agreement required the "grantee" to pay a four percent franchise fee on "its gross income derived from all gas sales within the City of Edinburg." The words "the grantee" were defined to mean "Rio Grande Valley Gas Company, its successors, lessees, or assigns, and any individual, co-partnership, corporation, receiver, or other person or authority owning or operating . . . ." Under these terms, if the franchise rights were assigned, then the *assignee* would be responsible for "its gross income derived from all gas sales within the City of Edinburg."

The only gross income SU derived from sales of spot-market gas inside the city was its transportation revenue. While evidence was presented at trial establishing that the city had passed a separate ordinance setting rates and fees for "transportation" of gas, the city did not seek damages in this litigation for lost transportation fees. Therefore, we hold that no evidence supports the city's claims against SU for breach of the franchise agreement in failure to pay franchise fees.

For its claim regarding the lateral pipes, the city relies on section 9 of the franchise agreement, which provided:

> The Grantee herein [RGVG] may not sell, transfer, or assign any portion of the rights, privileges, or duties required by this franchise to be performed by it without the express written consent of the City of Edinburg first being obtained.

Section 9 further provided that if the franchisee sold "rights, privileges or duties required to be performed by it" without permission, then

> this franchise shall be considered at an end and the provisions of SECTION 8 hereof shall apply to the City's right to purchase the assets of the Grantee regarding any such sale, transfer or assignment.

Section 8 of the ordinance provided that, if the city chose not to renew the franchise, the city had an option to purchase "the portion of the works, apparatus, mains, pipes, meters and supplies ... that are within the corporate limits." The jury found that RGVG/SU had sold "rights, privileges or duties required to be performed by it" without permission, and that the loss to the city from not exercising its right to buy the lateral pipes was $4,000,000. However, the trial judge disregarded this finding and awarded the city $0 in damages related to the transfer of the lateral pipes. We hold that the city failed to demonstrate a breach of the franchise agreement in the sale of the lateral pipes.

▆▆▆ The city contends that appellants unlawfully transferred the "right to own and operate" the lateral pipelines beneath the city's rights of way. In response, appellants make several arguments, the first being that the submission of this issue to the jury was not supported by the pleadings. The city argues that its pleadings

did support submission of this issue, and that appellants waived their complaint by making only a general "no pleadings" objection that failed to specify how the proposed question failed to relate to the pleadings. We hold that appellants did properly object, and that the city's pleadings did not support submission of this question.

A party objecting to a charge must point out distinctly the objectionable matter and grounds of the objection. Tex.R.Civ.P. 274. One of the purposes of this rule is to discourage the use of general stock objections such as "no pleadings." *Monsanto Co. v. Milam,* 494 S.W.2d 534, 537 (Tex. 1973). In this case, while the attorney for one appellant made just such a stock "no pleadings" objection, the attorney for another appellant objected more specifically that "any claim for breach of Ordinance 1129 under section 8 or 9 is not supported by the pleadings." The trial judge ordered the attorneys for the various appellants to adopt the objections of each other defendant so as to avoid the delay of requiring duplicative objections. This had the effect of making the objections of each apply to all. *See Owens–Corning Fiberglas Corp. v. Malone,* 916 S.W.2d 551, 556 (Tex.App.—Houston [1st Dist.] 1996), *aff'd,* 972 S.W.2d 35 (Tex.1998) (trial court may permit joint objections to save time); *Celotex Corp. v. Tate,* 797 S.W.2d 197, 202 (Tex.App.—Corpus Christi 1990, no writ) (same).

▆▆▆ While the city's pleadings did allege tortious interference with contract, the pleadings never referred to the lateral pipelines or the provisions of section 8 or 9 of the franchise agreement. The city's pleadings alleged that the appellants engaged in and provided access for unauthorized gas sales within the city. Although the jury charge asked the jury to assess damages based on the value of the lateral

pipelines, the only damages asserted in the pleadings were lost franchise fees. As discussed in the section of this opinion dealing with the city's "single business enterprise" and "sham to perpetrate fraud" claims, the test for determining whether the city's pleadings were sufficient is whether an opposing attorney of reasonable competence, with the pleadings before him, can ascertain the nature and basic issues of the controversy and what testimony will probably be relevant. *Horizon/CMS*, 34 S.W.3d at 896–97, 2000 Tex. LEXIS 88, at *23; *see* Tex.R.Civ.P. 45(b). With no reference whatsoever in the city's pleadings to the lateral pipes or section 8 or 9 of the franchise agreement, the city's pleadings failed to give appellants fair notice, and this issue should not have been submitted to the jury. Because the trial court disregarded the jury's answer regarding damages arising from the tortious interference question, we hold that the trial court's judgment was correct in this regard.[5]

### Amount of Lost Franchise Fees

The jury found that RGVG and/or SU violated the franchise agreement memorialized in Edinburg ordinance 1129 "with respect to payments due under the ordinance." The jury determined that the amount of unpaid franchise fees was $584,517.26 for the period when RGVG held the franchise, and $235,258.74 for the subsequent period when SU held the franchise. The city's evidence regarding the amount of lost franchise fees was presented primarily during the testimony of Carol Freedenthal, whom the city offered as an expert on the energy industry and economic damages within the context of the energy industry.

Appellants argue that Freedenthal's testimony should be disregarded because Freedenthal was not an expert on economic issues and relied on an untested methodology in calculating the city's damages. Freedenthal's degree was in chemical engineering, but he testified that he had been doing "economic analysis" "ever since I got out of college." Freedenthal testified that he was a widely-published writer about pricing in the natural gas field and had testified as an expert witness several times. Although he had never testified about damages from a franchise agreement before, he had testified about contractual damages in the natural gas industry. Freedenthal was also a member of the "International Association of Energy Economists."

Freedenthal testified that he calculated the franchise fees by finding the volumes of gas sold from various records and then applying prices he determined to be reasonable based on his experience in the natural gas field to estimate gross sales. From gross sales he determined what the 4% franchise fee would be, and compared that figure to the amount actually paid. He testified, and we agree, that the appellants' expert used essentially the same methodology as he did, only the two experts differed regarding which prices should apply and which figures to include as sales for which a franchise fee was owed. Freedenthal concluded that the total amount of missing franchise fees was $4.74 million.

Appellants argue that "Freedenthal acknowledged that he had no experience with the damages model he and the City prepared for this case, and that he was employing a new and untested meth-

---

5. The only damages assessed against appellant Mercado Gas Services, Inc., were for tortious interference with contract. Because we remove the city's recovery on this claim, we render judgment that the city take nothing as to Mercado.

odology." We disagree with this characterization of Freedenthal's testimony. Freedenthal's "model" was simply to determine the volume of gas sales that he believed should have been subject to the franchise agreement, determine the prices for those sales, and use those figures to determine what the 4% franchise fee would be. Freedenthal testified that he had used this approach many times, but that this was the first time he had used it to calculate franchise fees.

Appellants also argue that "Freedenthal testified that his damages model was crafted solely for purposes of this litigation." We do not agree that Freedenthal ever testified as such. Even if he had, the purpose of his damages model was to determine damages when a contract had been breached. It is difficult to imagine what purpose such a model might have other than litigation on the contract. Under circumstances such as these, the fact that a certain methodology was crafted solely for purposes of litigation should not weigh heavily against the admissibility of testimony based on the analytical model.

Appellants argue that Freedenthal's sales estimates should be disregarded because his calculations were based on "wholly fictitious gas prices" and gas sales volumes that were based, in part, on estimation. With regard to the prices, appellants fault Freedenthal for applying the higher prices from the regulating tariffs instead of the spot-market price. Freedenthal conceded that the prices actually paid were lower than the tariff prices he used in his calculations.

The city argues that the reason Freedenthal did not use the actual sales prices is because the actual sales prices did not include the fee for transporting the gas. However, this argument does not comport with Freedenthal's testimony. Freedenthal testified that, for the spot-market gas in question, ". . . the pricing became a two-part element. You have a transportation allowance and a commodity." This answer reflects that Freedenthal considered the transportation fee to be part of the sales prices. Freedenthal also testified that the tariff prices he used were higher than the commodity price and transportation price combined. Freedenthal explained that he used the tariff prices because "that represented the lost value to the city."

Clearly, Freedenthal's reason for using the tariff prices was not to factor in the transportation fee, but that he considered the tariff prices to be the correct price for Reata's sales. We agree that the price Freedenthal's factored into his calculations was the correct price. Because Reata was not a legitimately separate corporation from RGVG, RGVG's obligation to sell gas at the tariff prices extended to Reata. Therefore, Freedenthal was correct in applying the tariff prices to Reata's sales for the period when RGVG was the franchisee obligated to sell gas at tariff prices. In any event, the jury awarded only $819,776 in damages for lost franchise fees, considerably less than the $4.74 million estimated by Freedenthal. We hold that sufficient evidence supported the damages finding for lost franchise fees on gas sold by Reata and transported by RGVG.

### Fraudulent Inducement to Contract

Appellants argue that the city should not have been permitted to recover on a cause of action for fraudulent inducement into the franchise agreement because the city failed to plead it. We agree.

The Texas Supreme Court has indicated that fraudulent inducement is really only a simple fraud claim. *See DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex.1990); *Balogh v. Ramos*, 978

S.W.2d 696, 701 (Tex.App.—Corpus Christi 1998, pet. denied). The elements of fraud and fraudulent inducement, applicable here, are (1) a material misrepresentation, (2) which was false, and (3) which was either known to be false when made or was asserted without knowledge of the truth, (4) which was intended to be acted upon, (5) which was relied upon, and (6) which caused injury. *Id.*

The city did plead a fraud cause of action, but the city's pleadings had nothing to do with fraudulent inducement into the franchise agreement. Under its fraud cause of action, the city alleged that the appellants had sold spot-market gas without collection or payment of franchise fees and concealed these sales from the city. According to the city's fraud pleadings, every time the appellants made a franchise payment to the city without including franchise fees from the spot-market sales, appellants perpetrated a fraud or constructive fraud on the city. None of the allegations in the city's pleadings mention any fraud occurring at or before the time the parties agreed to the franchise agreement. The words "induce" or "inducement" do not appear anywhere in connection with the city's fraud allegations. We conclude that the city's pleadings failed to provide appellants with fair notice that the city would pursue a cause of action for fraudulent inducement, and the trial court erred in entering judgment on this cause of action. *See* TEX.R.CIV.P. 47(a), 45(b); *Horizon/CMS*, 34 S.W.3d at 896–97, 2000 Tex. LEXIS 88, at *23. Therefore, we will remove the $300,000 award of exemplary damages that was premised on the fraudulent inducement cause of action.

### Waiver, Estoppel, and Ratification

■ Questions were submitted to the jury regarding whether the city was barred from asserting its claims due to waiver, estoppel, or ratification of the appellants' conduct. The jury answered each of these questions in the city's favor, and appellants now argue that these defenses were established as a matter of law.

■ Waiver is an affirmative defense that may be asserted against a party who intentionally relinquishes a known right or engages in intentional conduct inconsistent with that right. *Tenneco Inc. v. Enterprise Prods. Co.*, 925 S.W.2d 640, 643 (Tex.1996). Silence or inaction, for so long a period as to show an intention to yield a known right, may be proof of waiver. *Id.* Estoppel arises where, by fault of one, another is induced to change his or her position for the worse. *Herschbach v. City of Corpus Christi*, 883 S.W.2d 720, 736 (Tex.App.—Corpus Christi 1994, writ denied). Ratification occurs when a party continues to accept benefits under a transaction or conducts itself so as to recognize the transaction as binding. *Arroyo Shrimp Farm, Inc. v. Hung Shrimp Farm, Inc.* 927 S.W.2d 146, 151–52 (Tex. App.—Corpus Christi 1996, no writ). However, when a person accepting benefits does not have knowledge of all material facts, ratification or estoppel cannot ensue. *Herschbach*, 883 S.W.2d at 737.

The jury instructions on "ratification" were substantially correct in relation to the definitions above. The instructions on "waiver" and "estoppel," however, asked the jury to determine whether

1. The City of Edinburg

 a. by words or conduct made a false representation or concealed material facts,

 b. with knowledge of the facts or with knowledge or information that would lead a reasonable person to discover the facts, and

c. with the intention that Rio Grande Valley Gas Company would rely on the false representation or concealment in acting or deciding not to act; and

2. Rio Grande Valley Gas Company

a. did not know and had no means of knowing the real facts and

b. relied to its detriment on the false representation or concealment of material facts.

Appellants did not object to these instructions. Therefore, we are required to evaluate the sufficiency of the evidence according to the instructions given to the jury, regardless of how much those instructions may have varied from the proper legal meanings of the terms "waiver" and "estoppel." *Kolster v. City of El Paso,* 972 S.W.2d 58, 59 (Tex.1998); *Larson v. Cook Consultants, Inc.,* 690 S.W.2d 567, 568 (Tex.1985).

Under the instructions given the jury, appellants are unable to establish waiver and estoppel as a matter of law. There is simply no evidence, let alone conclusive evidence, that the city "made a false representation or concealed material facts." Appellants do not point to any false representation or concealment of material facts, and our review of the record reveals none. Instead, appellants focus their argument on the traditional elements of waiver, estoppel, and ratification, which do not require a showing of a false representation or concealment of material facts. By failing to attack the jury's answer on the terms submitted to the jury, appellants' arguments fail. *Id.*

██ Even if we were to evaluate the sufficiency of the evidence according to proper definitions of waiver and estoppel, appellants' arguments still fail, for the same reason that their arguments regarding ratification fail. Appellants argue that

they presented evidence to conclusively establish that the city knew Reata was selling spot-market gas "transported" by RGVG to customers inside Edinburg, and that the city approved of this practice. There is, in fact, a great deal of evidence that the city was aware of the spot-market gas sales, and that, rather than demanding a franchise fee on these sales, the city supported these sales. Appellants correctly insist that the city's franchise did not prevent other entities selling gas to customers inside the city limits. TEX. CONST. art. I, § 26; *see Clear Lake City Water Auth. v. Clear Lake Utils. Co.,* 549 S.W.2d 385, 391 (Tex.1977) (water authority could not bind itself to single water supplier); *see also City of Brenham v. Brenham Water Co.,* 67 Tex. 542, 4 S.W. 143, 156 (1887) (exclusive privilege for supply of water was unconstitutional).

However, we have held that legally and factually sufficient evidence supported the jury's finding that Reata, RGVG, and the rest of the Valero corporate family were in fact *not* separate entities, but rather that the obligations and actions of each corporate subsidiary should be imputed throughout the Valero corporate family. There is no evidence that the city knew that the Valero corporations were not being conducted as separate entities. Without evidence of such knowledge, appellants' waiver, estoppel, and ratification defenses all fail. *See Tenneco v. Enterprise Prods.,* 925 S.W.2d at 643 (waiver is intentional relinquishment of known right); *see also Herschbach,* 883 S.W.2d at 737 (defenses of ratification and estoppel require showing that a person accepting benefits under agreement has knowledge of all material facts).

## Primary Jurisdiction and the Filed Rate Doctrine

██ Appellants claim that the trial court was without jurisdiction to consider

this appeal under the "primary jurisdiction" and "filed rate" doctrines. The doctrine of primary jurisdiction applies where there is a question of jurisdiction between a court and an administrative agency. *American Pawn and Jewelry, Inc. v. Kayal*, 923 S.W.2d 670, 673 (Tex.App.—Corpus Christi 1996, writ denied). Where some parts of the case are within the exclusive jurisdiction of the agency, primary jurisdiction lies with the agency. *Foree v. Crown Central Petroleum Corp.*, 431 S.W.2d 312, 316 (Tex.1968); *State Bar of Tex. v. McGee*, 972 S.W.2d 770, 773 (Tex.App.—Corpus Christi 1998). Because the purpose of the doctrine is to assure that the agency will not be bypassed on what is especially committed to it, and because resort to the courts is still open after the agency has acted, the doctrine applies even if the agency is powerless to grant the relief sought, but does have authority to make incidental findings necessary to the granting of relief in a later judicial action. *Id.*

 Under the "filed rate" doctrine, a filed tariff has the effect of law governing the relationship between the utility and its customers. *Entex, a Div. of Reliant Energy Resources Corp. v. Railroad Comm'n of Tex.*, 18 S.W.3d 858, 863 (Tex.App.—Austin 2000, pet. filed); *Southwestern Bell Tel. Co. v. Metro–Link Telecom, Inc.*, 919 S.W.2d 687, 692 (Tex.App.—Houston [14th Dist.] 1996, writ denied).

 First, appellants argue that the Gas Utility Regulatory Act assigns primary jurisdiction over the "rates, operations, and services" of a gas utility to within the municipality, *see* TEX.UTIL.CODE ANN. § 103.001 (Vernon 1998), and that any appeal of a municipal order on such a matter is to the Railroad Commission. *See* TEX.UTIL.CODE ANN. § 103.051 (Vernon 1998). However, appellants cite no authority indicating that a municipality is

empowered to adjudicate its own claim that a gas utility has breached a franchise agreement. Indeed, this result is not supported by precedent. *See REO Indus., Inc. v. Natural Gas Pipeline Co. of Am.*, 932 F.2d 447, 457 (5th Cir.1991) (primary jurisdiction did not lie with Railroad Commission because Commission has no jurisdiction to settle contractual dispute or award damages); *see also Biskamp v. General Crude Oil Co.*, 452 S.W.2d 515, 517 (Tex.App.—San Antonio 1970, writ ref'd) (primary jurisdiction did not apply because Railroad Commission had no authority to interpret contract).

 With regard to the "filed rate" doctrine, appellants argue that in passing an ordinance setting rates for transportation the city accepted the transportation practices of RGVG/SU, and, by this lawsuit, the city improperly attempted to alter the terms of the "filed rate" for transportation as embodied in the city's ordinance. However, with regard to RGVG, we have held that the city presented sufficient evidence to establish that RGVG's "transportation" was actually gas sales, subject to the franchise agreement the same as RGVG's sales that did not involve "transportation." With regard to SU's transportation, we have held that SU does not owe any franchise fees other than those established in the transportation ordinance. Therefore, our opinion is unchanged by appellants' arguments concerning the filed rate doctrine.

### "Most Favored Nations" Clause

 By way of a pre-trial motion for partial summary judgment, the city argued that SU should have to pay a franchise fee exceeding 4%, based on a "most favored nations" provision in the franchise agreement. The "most favored nations" provision stated

In the event the Grantee [RGVG/SU] should pay any other municipality which it serves a greater percentage than four (4%) percent of its said gross receipts, the Grantee hereby agrees that this franchise shall automatically be amended to provide for the payment of such higher percent to the City of Edinburg . . .

The city appeals the trial court's denial of this motion. As a general rule, appellate courts do not have jursidiction to hear denied motions for summary judgment on appeal. *Ackermann v. Vordenbaum*, 403 S.W.2d 362, 365 (Tex.1966); *Hines v. Commission for Lawyer Discipline*, 28 S.W.3d 697, 700 (Tex.App.—Corpus Christi 2000, no pet. h.); *Highlands Mgmt. Co. v. First Interstate Bank of Tex., N.A.*, 956 S.W.2d 749, 752 (Tex.App.—Houston[14th Dist.] 1997, pet. denied).

After the motion was denied, the city did not present nor attempt to present evidence to show what percentage franchise fees SU paid to other municipalities, or what additional franchise fees were owed to the city of Edinburg based on the appropriate higher percentage. Therefore nothing is preserved for appeal. Appellees' point of error is overruled.

### Attorney's Fees

Appellants also challenge the award of attorney's fees to the city. The city sought attorneys' fees based on Texas Civil Practice and Remedies Code section 37.009, which authorizes attorney's fees for declaratory relief, and section 38.001(8), which authorizes attorney's fees in a breach of contract action.

Appellants argue that the city was not entitled to recover attorney's fees on the breach of contract action because (1) the city's breach of contract claims are not valid; (2) the city recovered nothing under its breach of contract claims; (3) several of the Valero entities held jointly liable for the attorney's fees were not parties to the franchise agreement; (4) the jury question regarding attorney's fees was premised on a jury question that asked only whether RGVG/SU had breached the franchise agreement; (5) the city made no pretrial demand on VEC or VNGC, as required by section 38.002; and (6) the city failed to present proper evidence of its attorney's fees. We have already ruled on most of these arguments. We have held that the city's breach of contract claims are valid. We have also held that the city's arguments for disregarding the corporate separateness of the various Valero corporations are valid; therefore, arguments (3), (4), and (5) have also already been disposed of.

Appellants' argument that the city recovered nothing under its breach of contract claim hinges on its argument that the city failed to properly elect between the jury's damages findings. The jury found that the damages resulting from fraudulent inducement to contract and breach of contract were both $584,517.26. The actual damages awarded included a single award of $584,517.26. Because the city recovered exemplary damages, which are available for fraudulent inducement,[6] but not for breach of contract,[7] appellants argue that the city must have chosen to recover this sum under its fraudulent inducement claim and chosen to decline recovery under the breach of contract claim. However, we have held that the city is not entitled to recover on its cause of action for fraudulent inducement to contract.

---

6. *Artripe v. Hughes*, 857 S.W.2d 82, 87 (Tex. App.—Corpus Christi 1993, writ denied); *see* Tex.Civ.Prac. & Rem.Code Ann. § 41.003(a)(1) (Vernon 1997).

7. *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex.1986).

Therefore, we look only to the breach of contract claim in evaluating the attorney's fees awards.

Appellants also challenge the evidence supporting the city's claim for attorney's fees. Appellants claim that the city's evidence was, in legal effect, no evidence, because the city's attorneys failed to keep contemporaneous time records and because the city never actually paid any attorney's fees. They also challenge the summaries that the city's expert on attorney's fees, Craig Smyser, based his testimony on. Appellants complain that the summaries constituted hearsay information of which Smyser had no personal knowledge. Appellants also contend that the summaries were inadequate because, while they summarized the time spent on each task and the time spent by each attorney, they did not specify which attorneys had done which tasks. Appellants contend that the summaries were "riddled with patent inaccuracies and discrepancies which rendered them wholly unreliable and competent as evidence," and that the city failed to segregate the attorney's time between claims. Appellants also contend that the summaries were "grossly inflated." Appellants also complain that the city failed to supplement Smyser's deposition as required by Texas Rule of Civil Procedure 166b(6) to inform them of testimony Smyser would offer at trial that he did not present at the deposition.

■ We are unable to evaluate the merit of appellants' objections that Smyser's testimony exceeded the scope of his deposition because appellants have not identified where in the record Smyser's deposition can be found. The clerk's record in this case is more than 8000 pages long, and the reporter's record fills 181 volumes. It has never been considered part of an appellate court's duties in conducting judicial review to search the rec-

ord to determine where, or even if, a document is present. Tex.R.App.P. 38.1(h); *Fredonia State Bank v. General Am. Life Ins. Co.*, 881 S.W.2d 279, 283 (Tex.1994). This argument is waived. *Id.*

■ Appellants' argument that the summaries were inaccurate and inflated is also waived due to inadequate citation and briefing. Appellants' brief states that the summaries are inaccurate and inflated, and cites only to the place in the record where the summaries are to be found, without offering any argument or citing to anything in the record to explain *how* the summaries are inaccurate and inflated. This argument is also waived. Tex. R.App.P. 38.1(h).

■ Next, we consider appellants' challenge concerning Smyser's use of summaries on the ground that they were prepared by someone else, summarizing information of which Smyser had no personal knowledge. Appellants rely on *Red Top Taxi Co. v. Snow*, 452 S.W.2d 772 (Tex.Civ. App.—Corpus Christi 1970, no writ). In that case, we held insufficient an expert's testimony that physical therapy provided by another was necessary and the charges were reasonable. We removed the award of fees for physical therapy because the testifying expert lacked personal knowledge that the treatment was provided by the therapist listed on the bill, or knowledge of how many times the therapist had seen the patient. *Id.* at 779.

However, in a subsequent opinion we stepped back from such stringent requirements and allowed the trial court greater discretion in awarding attorney's fees. In *Richard Gill Co. v. Jackson's Landing*, 758 S.W.2d 921, 927 (Tex.App.—Corpus Christi 1988, writ denied), we upheld an award of attorney's fees based on testimony from a witness who lacked personal knowledge of the time spent on the case or

the fee charged. In the instant case, the expert testified based on summaries of the attorney's time. Although appellants argue that these summaries were not competent evidence, an expert may rely on data that is not admissible in evidence if it is of a type reasonably relied on by experts in the particular field. TEX.R.EVID. 703.

 Appellants also challenge Smyser's reliance on the summaries because the summaries do not reflect that the city's attorneys kept contemporaneous time records, or specify which attorney performed which specific tasks. However, the absence of contemporaneous time records did not prevent us from upholding the award of attorney's fees in the *Richard Gill* case,[8] and it should not do so here. Although contemporaneous time records can be beneficial in assessing a claim for attorney's fees, they are not required.[9] Furthermore, while the summaries did not specify which tasks were performed by which attorneys, the summaries did indicate the total amount of time spent by each attorney. We conclude that the summaries relied on by Smyser were not so deficient as to render his testimony "no evidence."

 Next, we consider appellants' argument that the city failed to segregate those attorney's fees attributable to claims that permit recovery of attorney's fees from those attorney's fees attributable to claims that do not permit recovery of attorney's fees. The city argues that its claims were so interwoven that it should be permitted to recover *all* attorney's fees. A plaintiff seeking attorney's fees is required to show that the fees were incurred while suing the defendant sought to be charged with the fees and to distinguish between fees attributable to claims which allow recovery of attorney's fees and fees not attributable to claims which allow recovery of attorney's fees. *Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 10 (Tex.1991). An exception to this rule applies when the claim permitting attorney's fees is so interrelated with other claims that their prosecution entails proof of essentially the same facts. *Id.* at 11.

The segregation of attorney's fees issue in this case is similar to the segregation of attorney's fees issue in *Pegasus Energy Group, Inc. v. Cheyenne Petroleum,* 3 S.W.3d 112 (Tex.App.—Corpus Christi 1999, pet. denied). In that case, a gas and oil well operator brought causes of action for breach of contract, fraud, negligent misrepresentation, and fraudulent concealment arising from disputes concerning the management of a well. The defendant also filed a counter-claim alleging breach

---

8. *See Richard Gill,* 758 S.W.2d at 928–29.

9. Factors that a factfinder should consider when determining the reasonableness of a fee include:
 (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;
 (2) the likelihood ... that the acceptance of the particular employment will preclude other employment by the lawyer;
 (3) the fee customarily charged in the locality for similar legal services;
 (4) the amount involved and the results obtained;
 (5) the time limitations imposed by the client or by the circumstances;
 (6) the nature and length of the professional relationship with the client;
 (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
 (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. *Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 818 (Tex.1997), (*citing* TEX.DISCIPLINARY R.PROF'L CONDUCT 1.04, *reprinted in* TEX.GOV'T CODE ANN., tit. 2, subtit. G app. A (TEX.STATE BAR R. art. X, § 9)).

of contract. We held that the plaintiff's claims and defenses to the defendant's counterclaim all arose from the ongoing management of the well, and were, therefore, sufficiently interrelated as to excuse the plaintiff from segregating the attorney's fees. *Id.* at 131.

In this case, all of the city's claims arise from the franchise agreement and the appellants' efforts to provide spot-market gas to industrial customers inside Edinburg without paying franchise fees. Although the city brought multiple theories of recovery and sued multiple parties, all of the causes of action are dependent on the same set of facts and circumstances, thus making the claims arising from those same facts inseparable and excusing the city from segregating its attorney's fees. *See Stewart Title v. Sterling,* 822 S.W.2d at 11.

Finally, we consider appellants' contention that the fees awarded, approximately $2.9 million for the trial, and up to $3.5 million through all appeals, are excessive in relation to the actual damages awarded, which we reform to be $584,517.26 before adding pre-judgment interest. Among the factors in determining the appropriate size of an award of attorney's fees are the amount involved and the results obtained. *Arthur Andersen,* 945 S.W.2d at 818. Attorney's fees must be reasonable under the particular circumstances of the case and must bear a reasonable relationship to the amount in controversy. *U.S. Steel Corp. v. Whitley,* 636 S.W.2d 465, 470 (Tex.Civ.App.—Corpus Christi 1982, writ ref'd n.r.e.).

Appellants do not dispute that this was a case of extraordinary complexity. They contend, rather, that, regardless of the case's complexity, the city should not recover attorney's fees that are several times the amount of actual damages.

However, the amount of damages is only one factor to be considered. *Gilbert v. Pettiette,* 7 S.W.3d 895, 898 (Tex.App.—Houston [1st Dist.] 1999, no pet.); *Texas Fed. Sav. & Loan Ass'n v. Sealock,* 737 S.W.2d 870, 884 (Tex.App.—Dallas 1987, *rev'd on other grounds,* 755 S.W.2d 69 (Tex.1988)); *Murrco Agency, Inc. v. Ryan,* 800 S.W.2d 600, 607 (Tex.App.—Dallas 1990, no writ); *Braswell v. Braswell,* 476 S.W.2d 444, 446 (Tex.Civ.App.—Waco 1972, writ dism'd). As previously noted, the filings in this case produced a clerk's record of more than 8000 pages. The seven-week trial produced a reporter's record of 181 volumes. The defendants utilized thirty-three different lawyers from ten law firms in preparing this case. The city's attorneys documented the amount of time expended and the activities that time was used on; in fact, the figure urged by the city for its attorney's fees was $1 million more than was awarded by the jury. Given the complexity of this case and the evidence of the extraordinary amount of work expended in preparing and trying the case, we hold that sufficient evidence supported the attorney's fees awarded.

### Purpresture

The judgment contained a decree that certain lateral pipelines owned by Valero Transmission, L.P. (VTLP) constitute a purpresture. A purpresture is an encroachment without consent upon public rights, property, or easements, or the appropriation for private use of that which belongs to the public. *Hill Farm, Inc. v. Hill County,* 436 S.W.2d 320, 321 (Tex. 1969).

The city argues that it gave its consent for pipeline ownership in the public right-of-way only to RGVG, and that it did not consent to the transfer of the pipelines

away from RGVG and eventually[10] into the hands of VTLP. Valero Transmission, L.P., is the successor of VTC. We have already upheld the jury's finding that RGVG and VTC were operated as a single business enterprise, and that this single business enterprise finding has the legal effect of extending RGVG's rights and obligations throughout the Valero family. While this finding helped support the city's claim for franchise fees on sales from other Valero corporations, it defeats the city's claim that VTLP had no right to own pipelines inside the city. Because VTC, predecessor in interest to VTLP, was operated as a single entity with RGVG, VTLP had the same rights to own pipelines as RGVG. We hold, therefore, that no evidence supported the finding that the specified VTLP pipelines constitute a purpresture, and render judgment that VTLP's ownership of these pipelines does not constitute a purpresture.

## Conclusion

We modify the trial court's actual damages award and render judgment that the city of Edinburg recover $584,517.26 in actual damages, plus $189,928.07[11] in prejudgment interest, from Rio Grande Valley Gas Company, Valero Energy Corporation, Valero Transmission Company, Valero Natural Gas Co., and Reata Industrial Gas Company, jointly and severally. We affirm the trial court's award of $3,518,000 for trial and conditional appellate attorney's fees, for which Rio Grande Valley Gas Company, Valero Energy Corporation, Valero Transmission Company, Valero Natural Gas Co., Reata Industrial Gas

Company, and Southern Union Company are jointly and severally liable. We reverse the damages assessed against Mercado Gas Services, Inc. and render judgment that Edinburg recover nothing from Mercado, and reverse the judgment's award of actual damages against Southern Union Company.

---

10. Ownership of the pipelines were passed between several different entities as the Valero corporate family restructured. The complicated chain of ownership is not relevant to this appeal.

11. This figure comes from an "exhibit" to the trial court's judgment, which calculated 10% simple interest from August 31, 1995, the day this suit was filed, through the day before the judgment was signed, November 30, 1998. Appellants do not challenge the pre-judgment interest awarded by the trial court.